1    Jeffrey Willis, Esq. (Nevada Bar No. 6851)
2    Brian R. Reeve, Esq. (Nevada Bar No. 10197)
    SNELL & WILMER L.L.P.
3    3883 Howard Hughes Parkway, Suite 1100
    Las Vegas, Nevada 89169
    Telephone: (702) 784-5200
4    Facsimile: (702) 784-5252

5    *Attorneys for all Defendants*

6

7

8            **UNITED STATES DISTRICT COURT**

9               **DISTRICT OF NEVADA**

10   FEDERAL TRADE COMMISSION,

11           Plaintiff,         CASE NO. 2:08-cv-00620-PMP-PAL

12   vs.

13   PUBLISHERS BUSINESS SERVICES,    **DEFENDANTS' MOTION FOR**
    INC., et al.,                        **SUMMARY JUDGMENT**

14

15            Defendants.       **(ORAL ARGUMENT REQUESTED)**

16

17        Defendants, PUBLISHERS BUSINESS SERVICES, INC., ED DANTUMA

18   ENTERPRISES, INC., PERSIS DANTUMA, EDWARD DANTUMA, BRENDA DANTUMA

19   SCHANG, DIRK DANTUMA, JEFF DANTUMA, and DRIES DANTUMA (collectively

20   "Defendants"), by and through their counsel of record, hereby move for summary judgment

21   pursuant to Fed. R. Civ. P. 56 on all Counts of the Amended Complaint.

22        This Motion is supported by the following points and authorities, the Exhibits attached

23   hereto and any oral argument allowed by the Court.

24   **I.**     <u>**INTRODUCTION**</u>

25        The undisputed material facts establish that Defendants are entitled to summary judgment.

26   The FTC alleges that Defendants, sellers of magazines for decades, have violated Section 5 of the

27   Federal Trade Commission Act (the "FTC Act") and the Telemarketing Sales Rule ("TSR"). The

28   method and manner in which Defendants have conducted business do not contravene Section 5 of

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

the FTC Act. The FTC's allegations regarding the TSR are completely inapposite, because the express terms of the TSR exempt Defendants from its scope. (Nevertheless, Defendants comply with the TSR as a matter of good business practice.) The episodic and anecdotal hearsay evidence offered by the FTC in support of its case is facially insufficient to create a genuine issue of material fact, and is unreliable in any event. Because the FTC cannot satisfy its burden of proof as a matter of law, Defendants respectfully move for summary judgment in their favor on all Counts of the Amended Complaint.

## II.    UNDISPUTED MATERIAL FACTS

### A.    Ed Dantuma Enterprises and Publishers Business Services

Edward Dantuma entered the magazine sales business in 1949. (See Declaration of Dirk Dantuma ["Dirk Decl."] at ¶5, attached hereto as Exhibit A.) At the time, telemarketing did not exist; instead, salesmen went door-to-door selling magazine subscriptions. (See id.) In 1955, Mr. Dantuma purchased a magazine sales franchise and opened an office in Toledo, Ohio. (See id. at ¶6.) After approximately twenty-five years with the franchise, Mr. Dantuma started his own magazine sales business, Ed Dantuma Enterprises.[1] (See id.) Along with his wife, Persis Dantuma, four of Ed Dantuma's children also have participated in the business at various times: Dirk Dantuma, Jeff Dantuma, Brenda Dantuma Schang, and Dries Dantuma. (See id. at ¶7.)

In 1998, after the FTC adopted the TSR, Mr. Dantuma formed Publishers Business Services, Inc. to reflect a change in marketing strategy to call only businesses.[2] (See id. at ¶8.) The decision to call businesses exclusively was based on the increasing restrictions on telemarketers by the proliferation of "do-not-call lists," and because the TSR explicitly exempts calls to a business. (See id. at ¶9.) To this day, PBS continues operations from the same office in Toledo, Ohio, and has the same phone number used in 1955. (See id. at ¶11.) As business opportunities arose, PBS opened offices in Miami, Florida; St. Paul, Minnesota; Altamonte

---

[1] Ed Dantuma Enterprises does business as Publishers Direct Services.

[2] Ed Dantuma Enterprises and Publishers Business Services, Inc. collectively shall hereinafter be referred to as "PBS."

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Snell & Wilmer

L.L.P.

LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   Springs, Florida; and a virtual office in Henderson, Nevada.[3]  (See id.)

2       PBS has been a Chamber Trustee of the Orlando Regional Chamber of Commerce since

3   February 2000.[4]  (See Declaration of Dries Dantuma ["Dries Decl."] at ¶5, attached hereto as

4   Exhibit B.)  PBS is also a member of the American Telemarketing Association and the Audit

5   Bureau of Circulations.  (See id. at ¶6.)  As a member of the Audit Bureau of Circulations, PBS

6   voluntarily submits to random audits regarding its sales and business practices.  (See id.)

7       At the time the FTC filed this suit, PBS employed approximately 260 employees, some of

8   whom have worked for PBS for 20-30 years.  (See id. at ¶7.)  PBS provides its employees with

9   numerous benefits including health, dental, vision, life and disability insurance; vacation pay, sick

10  time pay, and severance pay; opportunities to advance within the company; and regular pay

11  increases.  (See id. at ¶8.)

12      Each employee is provided with an employee handbook that explains PBS's company

13  policies.  (See id. at ¶9; see also Employee Information Guide, an authentic copy of which is

14  attached to Dries Decl. as Exhibit 1.)  Employees working in the sales departments receive sales

15  training and are given scripts to follow word-for-word.  (See id. at ¶10.)  Employees working in

16  the customer service department receive training in customer service, including written training

17  materials that explain the duty of a customer service representative and how to respond to certain

18  predictable situations.  (See id. at ¶11; see also Duties for Customer Service, an authentic copy of

19  which is attached to Dries Decl. as Exhibit 2.)  Employees working in the collections department

20  receive a copy of PBS's Collection Guidelines, as well as hands-on training in collecting

21  customer accounts professionally and responsibly.  (See id. at ¶12; see also Collection Guidelines,

22  an authentic copy of which is attached to Dries Decl. as Exhibit 3.)  Violations of company policy

23  or federal or state laws are grounds for discipline, including termination.  (See id. at ¶13.)

24  Defendants have terminated employees for, inter alia, not following the scripts and mistreating

25  customers.  (See id.)

---

26  [3] The poor economy and expense associated with defending this lawsuit forced PBS to close its
    St. Paul, Minnesota and Henderson, Nevada offices.  PBS has also been forced to lay off more

27  than 100 employees since the inception of this lawsuit, which represents a 38% reduction in work
    force. (See Dirk Decl. at fn 1.)

28  [4] PBS's membership lapsed for six months in 2006, and recently, May through July 2009, which
    was simply a billing issue.  (See Dries Decl. at fn 1.)

Since at least 1998, PBS has called only businesses to market its magazines. (See Dirk Decl. at ¶10.) PBS only sells magazines; it does not sell nondurable office or cleaning supplies or any other goods or services. (See id.) To ensure that only businesses are called, PBS purchases "lead cards" from Dun & Bradstreet, which contain the name, address and phone number of a business. (See id. at ¶12; see also sample Dun & Bradstreet cards, authentic copies of which are attached to Dirk Decl. as Exhibit 1.) PBS currently receives approximately 350,000 lead cards per month[5] and pays approximately $25,000.00 a month for the Dun & Bradstreet lead cards. (See id. at ¶14-15.) Typically, PBS calls all of the Dun & Bradstreet leads it receives each month within a month's time. (See id. at ¶15.) Thus, prior to PBS's recent office closures and lay-offs, PBS was making approximately 530,000 calls to potential customers per month. (See id.) PBS is currently making approximately 350,000 calls to potential customers per month. (See id.)

During the five years from January 1, 2004[6] through December 31, 2008, PBS made approximately 25,000,000 calls to businesses for the purpose of selling magazine subscriptions. (See Dries Decl. at ¶14.) Of those calls, Defendants generated approximately 245,000 customers, or less than one-tenth of one percent of all calls made. (See id.; see also Mail Report Payment Plan, an authentic copy of which is attached to Dries Decl. as Exhibit 4.)

**B.    PBS Orders and SOS Orders**

PBS offers two different types of magazine subscriptions: PBS ("Paid by Subscription") orders and SOS ("Single Order Subscription" or "Subscription Order Service") orders. (See Declaration of Jeffrey Dantuma ["Jeff Decl."] at ¶5, attached hereto as Exhibit C.) PBS orders are multiple subscriptions usually consisting of between five to seven different magazines and lasting 60 months. (See id. at ¶6.) Instead of charging customers a small amount for the magazines each month for 60 months, the customer pays the entire subscription over the first 24 or 30 months. (See id.) This means that a customer will pay nothing the remaining 36 or 30 months left on the order.[7] (See id.) Because PBS orders are paid in installments, PBS informs

---

[5] Prior to closing its St. Paul office and recent lay-offs, PBS was ordering approximately 530,000 lead cards per month. (See Dirk Decl. at fn 2.)

[6] The FTC's written discovery requests sought information from January 1, 2004.

[7] Customers have the option to pay for the entire subscription amount up-front, and some choose to do this. (See Jeff Decl. at ¶6.)

1    potential customers during a tape-recorded telephone call that it has a non-cancellation policy

2    during the term of the agreement, but that the order will cancel automatically once the 60-month

3    term has ended.  (The PBS ordering process is explained in more detail below.)  (See id. at ¶7.)

4         An SOS order is a single order subscription which, as the name suggests, is an order

5    consisting of just one magazine.  (See id. at ¶8.)  For an SOS order, the customer agrees to pay

6    the entire amount of the magazine subscription up front.  (See id.)  If a customer verbally agrees

7    to purchase the subscription over the telephone, PBS will not process the subscription order with

8    the publishers until it receives payment.  (See id.)  Since SOS orders are basic, single order

9    transactions, PBS does not tape record any portion of the order.  (See id. at ¶9.)  SOS orders

10   constitute approximately 3% of Defendants' gross revenues.[8]  (See id. at ¶10; see also Profit/Loss

11   Spreadsheet, an authentic copy of which is attached to Jeff Decl. as Exhibit 1.)

12        **C.      The Ordering Process for "PBS" Orders**

13        To ensure that potential customers understand and are willing to comply with the terms of

14   a PBS order, PBS has implemented a three-phase process: (1) the lead call; (2) the verification

15   call; and (3) the ten business-day internal control period.  (See id. at ¶11.)

16        The first phase of the ordering process is the "lead call."  (See id. at ¶13.)  During the lead

17   call, a potential customer typically speaks to two PBS representatives – a salesperson and then a

18   shift supervisor.  (See id. at ¶13.)  Each of PBS's salespeople is instructed to follow a marketing

19   script word-for-word.  (See id. at ¶14.)  The sales staff is supervised and randomly monitored.

20   (See id. at ¶14; see also Lead Call Script[9], an authentic copy of which is attached to Jeff Decl. as

21   Exhibit 2.)  PBS does not use a "rebuttal sheet," which means that if a potential customer does not

22   want the magazine offer, PBS salespeople do not try to persuade the potential customer to stay on

23   the phone by going down a rebuttal checklist.  (See id. at ¶15.)  Instead, PBS salespeople are

24   trained simply to thank the customer for his or her time, and end the call.  (See id.)

25        If the prospective customer expresses interest in the magazine offer, the customer is

26   transferred to the shift supervisor who reviews the order and payment plan with the customer.

27   _____

[8] The FTC has not made any specific allegations regarding the SOS portion of PBS's business.

28   [9] PBS modifies its marketing scripts slightly from time to time, but the same basic information appears in all scripts.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

(See id. at ¶16.)  The shift supervisor also follows a script.  (See id.; see also Supervisor Close, an authentic copy of which is attached to Jeff Decl. as Exhibit 3.)  At the end of the lead call, the shift supervisor notifies the potential customer that he or she will receive another call in the near future to confirm the order, and asks if the customer has any questions.  (See id. at ¶17.)    About 98-99% of the potential customers contacted decline the offer at some point during the lead call or do not even give PBS an opportunity to present the magazine offer.[10]  (See id.; see also PBS Leads (All offices) report, an authentic copy of which is attached to Jeff Decl. as Exhibit 4.)

A potential customer who expresses interest in purchasing magazines during the first phase of the sales process is called a "lead."  (See Dries Decl. at ¶15.)  Leads are sent to the Altamonte Springs, Florida, office for verification, which is phase two of the process.  (See id. at ¶15.)  The verification phase consists of a tape-recorded conversation between a PBS verifier and the potential customer.[11]  (See id. at ¶16.)

During the verification, the terms of the order are discussed with the potential customer, including the specific magazines, the amount of the monthly payments, the method of payment that the customer plans to use (check, credit card, etc.), the number of months that the customer will receive magazines, PBS's no-cancellation policy, the customer's shipping information, and that it takes 8-10 weeks to start receiving magazines.[12]  (See id. at ¶17.)  PBS verifiers are trained to follow a verification script word-for-word.  (See id.; see also Verification Script, an authentic copy of which is attached to Dries Decl. as Exhibit 5.)

At key points during the verification call, the verifier asks for a verbal "okay" from the customer to demonstrate the customer agrees to the terms of the order.  (See id. at ¶18.)  At the end of the verification call, the verifier notifies the customer when he or she should expect to receive the first statement, and asks the customer to make the first payment by a certain date.[13]

---

[10] This includes immediate hang-ups, no-answers, disconnected phone numbers, etc.

[11] Verifications are only recorded with the customer's permission.  If a customer does not authorize PBS to record the call, PBS will not proceed with the sale.

[12] Since June 2008, in addition to telling potential customers about the monthly cost of the magazines and the number of payments they will be required to make, PBS has also been telling customers the "total" cost of the magazine subscriptions.  (See Dries. Decl. at fn 5.)

[13] Unlike many other telemarketing companies, PBS does not ask potential customers to pay for the magazines up-front with a credit or debit card over the phone.  Instead, PBS relies on the customer's verbal commitment to make the monthly payments voluntarily.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   (See id.)  The verifier then asks the customer if he or she has any questions.  (See id.)

2       Unlike many other telemarketing companies, PBS does not ask potential customers to pay

3   for the magazines up-front with a credit or debit card over the phone.  (See id. at ¶19.)  Instead,

4   PBS relies on the customer's verbal commitment to make the monthly payments.  (See id.)

5   During phase two, approximately 40-50% of potential customers decline to proceed with the

6   order and, again, PBS does nothing further.  (See id. at ¶20; see also PBS Verifications (all

7   offices) report, an authentic copy of which is attached to Dries Decl. as Exhibit 6 and compare

8   with Exhibit 4 to Jeff Decl., which shows the number of leads PBS generated each month since

9   2004; Verification recordings of customers who signed declarations in support of FTC's Motion

10  for Temporary Restraining Order are attached to Dries Decl. as Exhibit 7.)

11      An order that passes through the verification process is considered a sale.  (See id. at ¶22.)

12  Once a sale has been made, PBS sends written materials to the customer containing all of the

13  material information discussed during the verification call and guaranteeing that there will be no

14  price increase during the term of the agreement.  (See id.; see also copy of guarantee, an authentic

15  copy of which is attached to Dries Decl. at Exhibit 8.)  This is phase three of the process.  (See

16  id.)

17      Although the customer already agreed to the terms of the order during the verification call,

18  PBS holds the sale for ten business days[14] (the "internal control period") before processing it with

19  the publishers.  (See id. at ¶23.) PBS does this for two key reasons: (1) to make sure the customer

20  understands the terms of the order; and (2) to give the customer another opportunity to cancel

21  before PBS enters the order with the publishers and pays the publishers for the magazines.  (See

22  id.)  If a customer contacts PBS within the internal control period and asks to cancel for any

23  reason, PBS honors the request without question.  (See id. at ¶24.)  Approximately 5% to 10% of

24  the customers who verbally verified the sale notify PBS of their desire to cancel the order during

25  the internal control period.  (See id.; see also Exhibit 4 to Dries Decl., which shows the number of

26  sales per month and the number of customers who cancelled by phone (KC) or by mail (KM)

27  during the internal control period.)

28  ─────────────
[14] Providing customers with more than ten days to review the terms of the order resulted in customer complaints that it took too long to start receiving magazines.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   If PBS does not hear from a customer during the internal control period, it enters the order

2   with the appropriate magazine publishers and fulfillment houses. (See id. at ¶25.) On average,

3   PBS pays between $65,000 and $70,000 a month to the publishers for the magazines it sells to its

4   customers. (See id. at ¶26; see also Average Monthly Expense Report, line item "Entry/Spread,"

5   an authentic, redacted[15] copy of which is attached to Dries Decl. as Exhibit 9.) During the term of

6   the order, PBS permits customers to swap out their magazines for different magazines on PBS's

7   list of publications as many times as they want.[16] (See id. at ¶27; see also Exhibit 8 to Dries

8   Decl.)

9       **D.    Renewals and Add-Ons**

10      A significant portion of PBS's business comes from renewals and add-ons. (See id. at

11  ¶28.) For renewals, PBS contacts customers before the end of their subscription to see if they

12  want to renew their order. (See id. at ¶29.) From January 1, 2004 through December 10, 2008,

13  over 25,000 customers renewed their orders. (See id.)

14      Add-ons occur when a customer increases the number of magazines on its current

15  account. (See id. at ¶30.) From January 1, 2004 through December 10, 2008, approximately

16  22,000 customers added magazines to their accounts. (See id. at ¶30.)

17      **E.    PBS Collections**

18      In the event a customer does not pay for the magazines after the sale has been entered with

19  the publishers, a PBS collector will attempt to collect on the unpaid account. (See id. at ¶31.)

20  PBS does not hire outside collection companies, nor does it report delinquent accounts to the

21  credit bureaus or initiate legal proceedings against customers with delinquent accounts. (See id.)

22      PBS collectors are trained, given specific collection guidelines, supervised and monitored.

23  (See id. at ¶32; see also Exhibit 3 to Dries Decl.) PBS collectors are instructed to make calls

24  during normal hours and to act professionally. (See id at ¶35.)

25      To help minimize complaints, PBS purchased a computer system that tracks collectors'

26  calls to customers on any given day and the results of the collectors' efforts. (See id. at ¶32.)

---

27  [15] This exhibit has been redacted because it contains confidential financial information. The FTC has previously been provided with an un-redacted copy of this report.

28  [16] Customers may change magazines once free of charge. After that, there is a $3.00 magazine change fee. (See Dries Decl. at ¶27.)

Depending on the size of a collector's batch of assigned accounts to work, the computer system generally will not allow a collector to call a customer who does not answer the phone multiple times a day. (See id. at ¶35.) PBS's company policy prohibits a collector from using abusive language, harassing customers, or threatening customers with legal proceedings or adverse credit repercussions. (See id. at ¶33.) If PBS substantiates a complaint that one of its collectors has violated company policy, the collector is disciplined and/or terminated depending on the severity of the violation. (See id.)

Once a collector speaks with a customer, a "hold" is placed on the customer account for a certain period of time so that the customer is not contacted again during the hold period. (See id. at ¶34.) The amount of time the account is placed on hold varies depending on the customer's representations to the collector. (See id.) For example, if a collector calls a customer and the customer represents to the collector that it cannot afford to make a payment, the customer's account will be placed on hold for approximately 15 days, after which it will be placed back into the collections system for a follow-up phone call. (See id.) Similarly, if a customer represents that it has already mailed in a payment, the account will be placed on hold for 10 days, during which time if PBS receives the customer's payment, the account will not be placed back into the collections system for a follow-up call. (See id.) If a collector speaks with a customer, and the customer refuses to pay claiming that it does not want or never ordered the magazines, the collector is not authorized to call that customer any more and the customer account is sent to the customer service department for resolution.[17] (See id.)

PBS collectors are trained to try to "save the order" and, together with customer service representatives, are authorized to modify orders for that purpose. (See id. at ¶36.) An order may be modified by changing the number of magazines a customer receives, changing the payment plan, providing a discount, reducing the term of the order, or any number of alternatives. (See id.)

In situations where a customer demonstrates loss of income or financial hardship, PBS is willing to work with the customer by postponing the start-date of bills or making other arrangements. (See id. at ¶37.) PBS collectors and customer service representatives are also

_____
[17] Depending on the resolution, the customer service department may place an account back into the collections system. (See Dries Decl. at fn 8.)

1  trained to delete pending payments when requested by the customer, send reminder letters for up-
2  coming payments, maintain PBS's internal "do-not-call" list, tape record payment authorizations
3  for payments made over the telephone, and cancel accounts if they cannot resolve a customer's
4  concerns.[18]  (See id. at ¶38.)

5      **F.      Complaints Against PBS**

6      Despite PBS's three-phase sales process and training efforts, it still receives "complaints"
7  from customers and non-customers.[19]  (See id. at ¶39.)  If a customer contacts PBS with an
8  inquiry or expressing dissatisfaction, a customer service representative will respond to the request
9  and attempt to resolve the customer's concerns.  (See id. at ¶40.)  If there is an issue as to whether
10 a customer agreed to the magazine order during the verification, the customer service
11 representative will play the verification tape.  (See id. at ¶41.)  If it turns out that a customer in
12 fact declined or did not otherwise commit to the order, or a verifier misstated or omitted material
13 information during the verification, then the account is cancelled and the customer receives a
14 refund for any amounts paid.  (See id.)  As a quality control measure, PBS keeps track of these
15 instances, referred to internally as "bad tapes."  (See id.; see also sample pages of Bad Tape
16 Detail Report, authentic copies of which are attached to Dries Decl. as Exhibit 10.)

17     While PBS strives to accommodate its customers and resolve their concerns, some
18 customers complain – sometimes without even first giving PBS an opportunity to resolve the
19 issue – to consumer organizations,[20] private attorneys, or government entities such as State
20 Attorney Generals' offices and the Federal Trade Commission (collectively "Third Party
21 Complaints").  (See id. at ¶42.)  PBS takes Third Party Complaints seriously[21] and makes an
22 effort to resolve each one to the customer's satisfaction, including cancelling the customer's
23 account if necessary.  (See id.)  Of the total number of potential customers PBS contacts in a year,
24 less than one-thousandth of one percent submit a Third Party Complaint.  (See id. at ¶43; see also

---

[18] Since the order has already been entered with the magazine publishers, often the customer will continue to receive magazines free of charge.

[19] Non-customers typically include persons who were contacted by PBS to purchase magazines, but declined the magazine offer during the sales process, or the parent, spouse or work supervisor of a customer.  All customers are over the age of 18.  (See Dries Decl. at ¶39.)

[20] Most commonly, the Better Business Bureau ("BBB").

[21] PBS tracks the number of Third Party Complaints it receives, which PBS employees interacted with the customer, and whether PBS could have done something to prevent the complaint.

- 10 -

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   Account vs. Complaint report, an authentic copy of which is attached to Dries Decl. as Exhibit

2   11.)  Of the total number of customers PBS generates in a year (those who complete phases one

3   and two of the sales process), less than one-half of one percent submit a Third Party Complaint.

4   (See id.)

5         Unlike many fly-by-night, scam companies, PBS has always cooperated with official

6   inquiries and has never attempted to evade authorities by fleeing or changing its name or address.

7   (See Dirk Decl. at ¶19.)  PBS provides its customers with its address, phone number, and e-mail

8   address.  (See id.)  As stated above, Defendants have occupied their Toledo office for over fifty

9   years and only organized Publishers Business Services, Inc. to reflect its change in marketing

10  strategy.  PBS constantly reviews complaints against the company and diligently works with

11  proper authorities to reduce the number of future complaints.  (See id. at ¶20.)  PBS also makes

12  every effort to comply with the TSR,[22] the FTC Act, and debt collection laws.  (See id.)

13  **III.   LEGAL ARGUMENT**

14        **A.   Defendants are Entitled To Summary Judgment on Counts I and II of the**
          **Amended Complaint because PBS Complies with Section 5 of the FTC Act.**

15            **1.   Standard of Proof for a Violation of Section 5**

16

17        Defendants are entitled to summary judgment on Counts I and II of the Amended

18  Complaint, which allege violations of Section 5 of the FTC Act, because PBS does not engage in

19  any deceptive or unfair trade practices.  PBS fully discloses to customers what it is selling and the

20  terms of the sale.  Put simply, PBS does what it says it is going to do.  No customer is misled.

21        This is not to say that the lead call is without some effort to engage the potential customer.

22  Pitches and sales commentary are not prohibited by Section 5, and for good reason.  Those in the

23  business of selling goods are permitted to engage potential customers and present their offers in

24  an attractive light.  Yet, despite the legality of competitive marketing, the FTC has focused its

25  case on PBS's non-material, non-actionable sales commentary.

26        Section 5 states that "[u]nfair methods of competition in or affecting commerce, and

27  unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15

28  [22] While the TSR specifically exempts calls to businesses, PBS still attempts to comply with its provisions as a matter of good business practice.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   U.S.C. § 45(a).  An act or practice is deceptive if each of the following elements is present: "*first*,

2   there is a representation, omission, or practice that, *second*, is likely to mislead consumers acting

3   reasonably under the circumstances, and, *third*, the representation, omission, or practice is

4   material." FTC v. Pantron I Corp., 33 F.3d 1088, 1095 (9th Cir. 1994) (Emphasis added).

5       The FTC cannot establish that Defendants violated Section 5 because all of PBS's

6   material representations are true, and its non-material sales commentary would not mislead any

7   customer acting "reasonably under the circumstances," even if it could be considered material.

8                   **2.      PBS's Material Representations Are True.**

9       PBS sells magazines, which are goods.  When goods are at issue, Courts have found

10  violations of Section 5 in two basic scenarios.  The first is when the nature of the goods is

11  misrepresented. See e.g., FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1169-70 (9th Cir.

12  1997) (finding a material misrepresentation where defendants told customers they would receive

13  high value prizes, when in fact no prizes or de minimis prizes were received); FTC v. Bay Area

14  Bus. Council, Inc., 423 F.3d 627, 635 (7th Cir. 2005) (finding a material misrepresentation where

15  defendants told customers they would receive credit cards, but instead they received stored-value

16  cards).  The second scenario in which a Section 5 violation may occur is when the cost of the

17  goods is misrepresented. See e.g., FTC v. Amy Travel Serv., Inc., 875 F.2d 564 (7th Cir. 1989)

18  (finding a material misrepresentation where defendant told customers that the cost of a week-long

19  vacation was equal to the cost of a "vacation passport," priced between $289 and $329, when in

20  fact, the vacation cost nearly $1,000 in additional fees).

21      PBS falls into neither of these categories.  The material representations PBS makes during

22  the first two phases of the sales process are that: (1) PBS is selling magazine subscriptions; (2) the

23  titles of the magazines it is selling; (3) the term of the subscription period is sixty months; (4) the

24  subscriptions are for a nominal amount when broken down on a weekly basis; (5) customers will

25  be charged on a monthly basis for twenty-four months, with no charges for the remaining thirty-

26  six months; and (6) PBS has a no-cancellation policy during the term of the order.  Each and

27  every one of these material representations is true.  The undisputed facts are that PBS sells

28  specific magazines to customers for the price and on the terms it represents, and delivers the

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

magazines it promised.  PBS has thousands of satisfied customers as evidenced by, among other things, the number of customers who renew their subscriptions each year.

The facts of this case bear absolutely no resemblance to those cases where a violation of Section 5 has been found due to a misrepresentation about the goods being sold.  For example, in FTC v. Bay Area Bus. Council, the court found a violation of Section 5 where telemarketers contacted potential customers regarding their purported "credit card applications," and represented that they "were guaranteed to receive a MasterCard that does not require a security deposit."  423 F.3d at 630.  However, instead of receiving a MasterCard, customers received an application for a stored-value "ChexCard MasterCard," which required them to preload their own funds.  The court stated, "[w]e take the defendants at their word that they never sold a credit card.  Unfortunately, they misled consumers into believing that was exactly what they were doing."  Id. at 635.  See also FTC v. Pantron I, 33 F.3d 1088 (finding a Section 5 violation where defendant represented that is hair re-growth formula was effective despite clear scientific evidence to the contrary).

Because it also involved the sale of magazines, Nat'l Trade Publ'n Serv., 300 F.2d 790 (8th Cir. 1962), provides a particularly powerful contrast to this case.   There, the defendants' sales representatives sold subscriptions to magazines that defendants were unauthorized to sell.  Defendants accepted payment for the wrongfully obtained subscriptions, falsely telling customers that their money would go to charity, and then forced customers to accept non-equivalent publications that defendants were authorized to sell.

In stark contrast, PBS offers customers only those magazines that it can deliver.  Further, by guaranteeing the customer a fixed price for five years, PBS bears the risk that the cost of the magazines will increase, because publishers may later charge PBS more for those magazines.  Unlike in Nat'l Trade Publ'n Serv., where defendants duped customers into buying goods they could not deliver, PBS delivers what it sells, and even absorbs the risk of increased costs to guarantee a fixed, low price to its customers.  For customers who do business with PBS, the goods sold are the goods received.  There is no deception.

### 3. Summary Judgment is Appropriate on Count I

Count I of the Amended Complaint alleges that Defendants mislead customers into believing that they will receive magazines for free or at a nominal cost, when in fact customers are charged hundreds of dollars. (See Am. Compl. at ¶ 26.) This contention ignores PBS's explicit and repeated disclosures of the cost of the subscriptions and the billing arrangements made during the 3-phase sales process. In the lead call, PBS explains *twice* that it offers low-cost magazine subscriptions. Then, during the verification call, PBS not only explains the cost again, it also asks customers whether they intend to pay for the magazines using a check or credit card and commits customers to send in their first payment by a certain date. PBS never says that the magazines are either free or a gift. Any belief that this is the case is simply not reasonable.

In the first part of the lead call, the sales representative states that the cost of the magazines is $2.76 per week.[23] *This is true*. Immediately after stating the weekly cost, the sales representative makes clear that PBS will collect payments on a monthly basis:

> We don't collect the $2 dollars and 76 cents each week, that would be sort of a nuisance, so what we do is send you a small supply of self-addressed envelopes and you can send it in by our monthly honor plan, or faster if you like. Most people send it in two months at a time since it is such a small amount. (See Exhibit 2 to Jeff Decl.)

The customer is soon afterwards transferred to a supervisor, who explains the billing arrangements in exact detail:

> It's all seven publications for just $2.76 a week, which is $11.96 a month, now instead of paying $11.96 each month for the full 60 months, we ask that you send it in two months at a time, which is $29.90 a month for the first 24 and nothing the remaining 36 months, do you see how that works? Ok _____, to guarantee these low rates, I'll lock in the price right now with the publishers and we will be calling you back shortly to confirm this with you. Now do you have any questions concerning your order Mr./Mrs. _____? (See Exhibit 3 to Jeff Decl.)

As promised, the customer soon receives a verification call, during which PBS again explains the billing arrangement:

---

[23] The dollar amounts referred to herein are taken from an actual script used in the PBS's sales efforts. Scripts are periodically revised on a minor scale, but all scripts contain the same basic representations. For the sake of clarity, this Motion refers to a single script, which is a fair and accurate representation of all scripts PBS has used.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

> Your payment plan and total cost as explained to you and also listed
> on your order will be _____ per month for only the first ___ months
> and you will pay nothing the remaining ___ months. Do you
> understand how that works Mr./Mrs._____? (See Exhibit 5 to
> Dries Decl.)

PBS's scripts demonstrate that it fully explains the cost of the magazines and the billing arrangements, and invites customers to ask questions. All of the representations made to customers are true: (1) that all the magazines together cost a total of $2.76 per week; (2) that all the magazines together cost a total of $11.96 per month; (3) that this cost is locked in for a full sixty months; (4) that Defendants collect payments on a monthly basis for the first twenty-four months; and (5) that no payments are collected for the final thirty-six months of the subscription. While the cost of seven magazines over five years amounts to several hundred dollars, this is hardly a surprise. PBS fully discloses the amount of the monthly payments and the period over which payments will be made. At no time is there any representation that the subscriptions are "free," or are a "gift."[24]

Courts have also found material misrepresentations where companies indicate that customers are buying low-cost goods, when in fact, the price of the goods has been marked up significantly. This was the case in FTC v. Security Rare Coin, 931 F.2d 1312, 1314 (8th Cir. 1991), where coins were represented to customers as being low-cost, despite having been "arbitrarily marked up...to...two or three times the wholesale price." Similar facts appear in FTC v. Solomon Trading Co., 1994 U.S. Dist. LEXIS 19696, *8 (D. Ariz. 1994), where the court found a material misrepresentation in defendant's marketing of artwork marked up to "over 100 percent of the wholesale price" as a low-cost investment.

There is no comparison between the facts of the present case and those described above. In all of those cases, the defendants deceive customers by concealing the total cost of the goods. Here, PBS truthfully represents the total cost of the magazines and explains the billing arrangements from its very first contact with customers in the lead call. PBS repeats the cost and billing arrangements in the verification call, at which time customers can reject the offer—many do. PBS then sends the customer a written guarantee and honors any request to cancel an account

---

[24] Since June 2008, PBS has been disclosing the "total" cost of the magazines during the verification call.

1  during the internal control period. Unlike the cases described above, there are no hidden fees that

2  come to light only after customers commit to purchasing magazines, no questionable investment

3  opportunities, nor any false representations about the nature or cost of goods. Stated simply,

4  there is no violation of Section 5. Accordingly, summary judgment is appropriate on Count I.

5  **4.    Summary Judgment is Appropriate on Count II**

6  Count II of the Amended Complaint alleges that Defendants misrepresent to customers

7  that they have entered into a contract with Defendants to purchase magazine subscriptions. The

8  evidence simply does not support these allegations. PBS's business policies expressly forbid

9  employees to represent to customers either that they are in breach of a contract, or that they

10 cannot cancel their orders. (See Exhibit 3 to Dries Decl.) Furthermore, PBS automatically

11 honors any request for cancelation made within the internal control period.

12 All collectors receive a copy of and are bound by the Collection Guidelines (the

13 "Guidelines"). With regard to cancelation, the Guidelines state as follows:

> Remember, at NO TIME should a customer be told that they cannot
> cancel an order. If a customer calls in requesting to cancel, ask
> them "why?" or "what seems to be the problem?" Most often, their
> answer will be that it's too much money. Remind the customer of
> the sale when they were told it's just $2.76 per week for all the
> publications…The $29.90 monthly payment pays approximately 11
> weeks at a time, so it pays the account off sooner. Sometimes you
> will get a customer that will still insist on canceling. If this
> happens, remind the customer of the second, verification phone call
> where they agreed to the order. If they still insist, simply say to
> them, "Let me see what I can do" and talk to a manager for
> guidance on the account. (See Exhibit 3 to Dries Decl.)

21 Upon the customer's request, PBS will play the tape recording of the customer's verbal

22 agreement to pay for the subscriptions monthly. If a mistake has occurred, and the customer did

23 not agree to pay, PBS cancels the account immediately. If a customer desires to cancel despite

24 having agreed to pay, PBS will try to save or modify the order to satisfy the customer. If this

25 does not work, PBS cancels the account and ceases all charges. Nevertheless, PBS continues to

26 provide customers with magazines that have already been ordered on their behalf, free of charge.

27 In these cases, customers not only get what they paid for, but also what they did not pay for.

28 Once again, PBS's business practices bear no resemblance to cases where courts have

- 16 -

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   found that a company deceived customers as to their payment obligations.  For example, in <u>FTC</u>

2   <u>v. Verity Int'l, Ltd.</u>, 443 F.3d 48, 63 (2d Cir. 2006), the court found that the defendants made

3   material misrepresentations in violation of Section 5 by causing "telephone-line subscribers to

4   receive explicit and implicit representations that they could not successfully avoid paying for

5   charges for adult entertainment that had been accessed over their phone lines – what we call a

6   'representation of uncontestability'. . . thereby 'capitalizing on the common and well-founded

7   perception held by customers that they must pay their telephone bills.'"

8       By contrast, when PBS is faced with a request for cancelation, PBS seeks to preserve its

9   business relationships through truthful reminders about the low cost of the subscriptions, and the

10  customer's verbal agreement to pay.  Nothing about these reminders is deceptive.  The law does

11  not prohibit PBS from trying to keep its customers' business by reminding them that they are

12  getting a good deal.  If these reminders fail to persuade the customer, PBS honors the request for

13  cancelation.  Because there is no credible evidence supporting the FTC's allegations, Defendants

14  are entitled to summary judgment on Count II.[25]

15      **5.   PBS's Non-Material Sales Commentary Would Not Mislead Any Customer Acting Reasonably under the Circumstances.**

16

17           a.    <u>The FTC cannot prove its claims</u>.

18      The core allegations of Counts I and II of the Amended Complaint are that customers are

19  misled into believing that the subscriptions are free.  Together, the plain terms of PBS's offer, the

20  percentage of customers who reject the offer, and the poor quality of the FTC's evidence, belie

21  any contention that customers are misled by PBS into agreeing to purchase the magazines.

22      Representations to the buying public must be weighed together "to ascertain the

23  impression that is likely to be created upon the prospective purchaser."  <u>Kalwajtys v. FTC</u>, 237

24  F.2d 654, 656 (7th Cir. 1956).  Taken as a whole, PBS's statements to customers during the sales

25  process clearly communicate all material terms of the order. The non-material comments in

26  PBS's sales efforts are not actionable under the FTC Act and, in any event, do not mislead

27  customers acting reasonably under the circumstances.  The non-material comments of which the

28  ___
    [25] Even if the term "contract" were used, such use would be truthful since there are mutual promises between PBS and the customer.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

FTC complains appear only in the lead call — one out of three contacts with customers during

PBS's sales process.  The lead call begins the following way:

> Hi, this is _____ with Publishers Business Service to whom am I speaking please?...We have been asked to contact a few business people in your area and I just wanted to ask you a few questions on your personal buying habits and if you could help me we have a small surprise for you, nothing big but it's nice.  (See Exhibit 2 to Jeff Decl.).

After the customer answers a few questions designed to permit PBS to evaluate the customer's creditworthiness, the customer sales representative continues:

> I want to thank you for helping me and with our best wishes you will receive the next 60 issues of [a selection of magazines]...Now, let me assure you that there is no catch involved, however, there is a sound business reason behind the whole thing.  The advertisers have authorized us to send the magazines I mentioned to assure them that their ads will be read...Now we're not going to ask you to buy any cash subscriptions or anything like that.  The only thing we have been asking people like yourself is to thank us in return by helping to defray the cost of getting them out to you, and I'm sure that you wouldn't mind that, because it's only $2 dollars and 76 cents a week which covers all 5 of the publications and there is absolutely no other charge, and its payable by the month, most people I've talked to today have been more than happy to go along with this and I'm sure that you too will agree that 5 magazines is quite a lot for just $2 dollars and 76 cents a week right! (See id.)

PBS immediately follows this portion of the lead call with the disclosure that payments

are not collected weekly, because that would be a nuisance, but rather that customers are billed on

a "monthly honor plan."  The supervisor then completes the lead call by explaining in detail that

the customer will be billed $29.90 per month for the first twenty-four months of the subscription

only.  (See Exhibit 3 to Jeff Decl.)

PBS makes the non-material comments that it has "a small surprise" for its customers; that

customers will receive magazines "with our best wishes;" that customers are not being asked to

buy "cash subscriptions," but rather to pay on a "monthly honor plan;" and that "most people are

happy to go along with" the billing arrangements.  None of the statements, taken alone or

together, equates with a representation that the subscriptions are free.  To remove any doubt that

there is a price attached to the subscriptions, PBS states in the lead call that the subscriptions cost

$2.76 per week and that the fees are collected on an accelerated monthly basis, so that the

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

customer pays $29.90 per month for only the first twenty-four months of the subscription.  In the verification call, PBS explains the billing arrangement again, commits the customer to make the monthly payments, asks whether the customer will be paying by check or credit card, and tells the customer when the first payment is due.  (See Exhibit 5 to Dries Decl.)  After these two calls, there could be no reasonable doubt about when and what the customer will be charged.  Even so, PBS sends customers a written package explaining the terms of the subscription, including the payment details, and guaranteeing the terms of the agreement.  Given the frequent and repeated references to costs and billing, no customer could reasonably believe the magazines were free.

The FTC contends that the word "surprise" in PBS's sales pitch, coupled with the phrase "with our best wishes you will receive [certain magazines]," could lead a customer, acting reasonably, to conclude that five years' worth of magazines would be free.  This is nonsense. Taken in context, when the customer is told on multiple occasions that the subscription is for five years, with the price broken down by week and by month, no potential customer could *reasonably* conclude that the magazines were free.

The FTC's narrow focus on the word "surprise" reveals its overall approach to the case, which has been to cherry-pick words and phrases from PBS's scripts, and to promote the least favorable meaning of these words in isolation.  (See Deposition of Jeffrey J. Dantuma, attached hereto as Exhibit D at 159:14-160:19, 165:21-166:15, 172:19-173:21, 191:1-192:19).  The law forbids this approach.  PBS's statements must be considered as a whole.  Kalwajtys, 239 F.2d at 656.  The FTC proves nothing by parsing PBS's sales pitch out of context.

The statement that there is "no other charge" besides the $2.76 per week is true.  Although PBS makes clear that it does not collect weekly, the total amounts it collects do not exceed the aggregate cost of $2.76 per week for sixty months.  No reasonable customer could believe after hearing that payments are collected monthly that he or she was being offered five years' worth of magazines for a one-time cost of $2.76.

Neither could PBS's statement in the lead call that customers can make payments on a "monthly honor plan" create the impression that the subscriptions are free.  First, the statement obviously communicates that *payments* are expected.  Second, the statement is true: PBS collects

payments monthly, and relies on the customers' verbal agreement to pay, rather than requiring the customer to pay up-front or to submit a credit or debit card number. Third, when the precise details of the billing arrangements are described twice on the phone and a third time in writing, and when customers expressly agree to be charged monthly for the subscriptions, the single use of the word "honor" could not lead a reasonable customer to believe she is free to pay or not pay as she sees fit. Viewing PBS's representations as a whole, the conclusion is inescapable that any customer acting reasonably would believe he or she was obligated to pay for the subscriptions on a monthly basis.

Similarly, the statement that customers are not being asked to buy "cash subscriptions" is both perfectly true and insufficient in any event to create a reasonable belief that the magazines are free. A cash subscription means that the customer must pay for the entire subscription in advance. (See Exhibit D at 191:20-193:2.) PBS has never required advance payment in full (although some customers choose this option). Instead, PBS clearly discloses that it collects monthly payments over a period of two years, and permits the customer to choose the method of payment. Even if a customer does not understand the precise meaning of "cash subscription," no reasonable customer could believe the magazines were free after the cost is broken down by week and by month, and the billing arrangements are fully explained.

Finally, the statement that most people are "more than happy" to go along with the payment schedule is completely irrelevant to any customer's decision whether to accept PBS's offer or not. No reasonable customer reaches a decision based on vague statements about the feelings of unnamed strangers. At worst, this comment is harmless puffing.

Section 5 regulates only those representations that are material. None of the comments above, which are stated one time, in passing, in the lead call, falls into that category. The statements do not concern price, efficacy, the nature of the goods, or any other of the myriad topics that courts have considered material. As such, they fall well within the latitude permitted a seller in marketing its goods. Any customer who fixates on these brief comments to the exclusion of the material information about cost and payment is not acting reasonably under the circumstances.

b.      The other uncontestable evidence disproves the FTC's claims.

The fact that customers understand PBS's representations is reinforced by statistics demonstrating that about 98-99% of the potential customers contacted decline the offer at some point during the lead call or do not even give PBS an opportunity to present the magazine offer; of those that expressed interest, another 40% to 50% reject the offer during the verification call; of those who received the written guarantee during the ten-day internal control period, an additional 5% to 10% cancel their orders.  This is clear and convincing evidence that no one acting reasonably has been or could be misled by PBS's sales efforts.

The FTC has offered only twenty-six declarations, not all of which are from customers. These declarations represent a statistically meaningless minority of PBS's tens of thousands of satisfied customers.  They are not only too few to create any material issue of fact as to whether PBS violated Section 5, but they are also unpersuasive in and of themselves.  Of the twenty-six total declarations the FTC presented in support of its Motion for a Temporary Restraining Order, only fifteen were those of actual customers.  Of those fifteen customers, three admit in their declarations that they agreed to purchase the magazines without paying attention to the explanation of the terms during the verification call.  (See Declarations of Z. Lowell Hopkins, Linda Nielsen, and Andrea Wong).  Eight admit that PBS agreed to cancel their accounts.  (See Declarations of John Barbey, Lindsay Fisher, Z. Lowell Hopkins, Adrian Lillard, Allison MacMillan, Linda Nielsen, Michael Truiano, and Andrea Wong).  As to all fifteen of the actual customers, PBS resolved their complaints.

Although PBS has been in business for decades and makes millions of telephone calls to potential customers each year, the FTC admits that it has received just 404 complaints between 1993 and 2008.[26]   (See FTC's Responses to Defendants' Interrogatories, Response No. 9, attached hereto Exhibit E.)  At best, the FTC's anecdotal evidence shows nothing more than the

---

[26] In the midst of the robust marketplace culture encouraging consumers to complain publicly about any unsatisfactory business transaction, perhaps the only surprising aspect of the complaints against PBS is their infrequency.  To confirm the fervency with which consumers are urged to complain, the Court has but to take judicial notice of the proliferation of websites such as www.ripoffreport.com, www.angieslist.com, www.complaints.com, www.consumeraction.gov, www.badbusiness.org, www.consumeraffairs.com, www.bbb.com, and innumerable other directory websites, such as www.citysearch.com, that invariably allow consumers to rate and review businesses.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   displeasure of a handful of PBS's hundreds of thousands of customers generated during that same

2   time period.  In virtually any business, some customers will be displeased and seek to avoid the

3   agreement; there is nothing probative about a tiny and disgruntled minority.  Because the FTC's

4   evidence is insufficient to raise a genuine issue of material fact showing that material

5   representations mislead consumers acting reasonably, and because substantial evidence

6   establishes that the FTC can never make that showing, Defendants are entitled to summary

7   judgment on Counts I and II of the Amended Complaint.

8         **B.      Defendants Are Entitled to Summary Judgment on Counts III-VI of the
                    Amended Complaint Because the Telemarketing Sales Rule Does Not Apply
9                   to Defendants and Was Not Violated in Any Event.**

10        Counts III through VI of the Amended Complaint allege various violations of the

11   Telemarketing Sales Rule ("TSR"), a rule which on its face does not apply to Defendants.

12   Accordingly, Defendants are entitled to summary judgment on Counts III-VI.

13        **1.      The Plain Language of the TSR Exempts Defendants from its
                    Requirements.**

14

15        On its face, 16 C.F.R. § 310.6(b)(7), a section of the TSR entitled "exemptions," makes

16   plain that PBS is not subject to the TSR.  The first rule of interpretation is that "the plain meaning

17   of a regulation governs." Safe Air for Everyone v. U.S. Envtl. Prot. Agency, 488 F.3d 1088,

18   1097 (9th Cir. 2007).  Courts should not consider other interpretative materials, even the agency's

19   own interpretation of the regulation, when the regulation has a plain meaning.  Id.; see also

20   Roberto v. Dep't of the Navy, 440 F.3d 1341, 1350 (Fed. Cir. 2006) (explaining that "If the

21   regulatory language is clear and unambiguous, the inquiry ends with the plain meaning.").  The

22   "plain meaning" rule is particularly important in interpreting administrative regulations, because

23   the public's right to participate in the rulemaking process under the Administrative Procedures

24   Act is only meaningful if the public can understand proposed rules.  Safe Air, 488 F.3d at 1098

25   (quoting Exportal Ltd. v. United States, 902 F.2d 45, 50-51 (D.C. Cir. 1990).

26        A regulation's plain language will not control, however, if "clearly expressed

27   [administrative] intent is to the contrary or [if] such plain meaning would lead to absurd results."

28   Safe Air, 488 F.3d at 1097.  The Ninth Circuit only invokes this exception to the plain meaning

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

1    rule when such clearly expressed administrative intent is referenced in the published notices that

2    accompany the rulemaking process.  <u>Webb v. Smart Document Solutions, LLC</u>, 499 F.3d 1078,

3    1085 (9th Cir. 2007).

4         The language of 16 C.F.R. § 310.6(b)(7) is plain and clear, and should therefore be

5    accorded its plain meaning.  That section provides as follows: "The following acts or practices are

6    exempt from this Rule…(7) [t]elephone calls between a telemarketer and any business, except

7    calls to induce the retail sale of nondurable office or cleaning supplies."  The only word in the

8    exemption that the TSR defines is "telemarketer."  The term "telemarketer" "means any person

9    who, in connection with telemarketing, initiates or receives telephone calls to or from a customer

10   or donor." 16 C.F.R. § 310.2(bb).   Defendants concede that they are telemarketers as that term is

11   defined in the TSR.  However, the remaining terms of the exemption are not defined in the TSR,

12   and must therefore be accorded their ordinary meaning.  <u>See</u> <u>Sherman v. U.S. Parole Comm'n</u>,

13   502 F.3d 869, 874 (9th Cir. 2007) (stating that "in the absence of a statutory definition, a term

14   should be accorded its ordinary meaning").

15        Giving the language of the TSR exemption its ordinary meaning means the following:

16   *anytime a telemarketer calls a business, i.e. dials a business's phone number, that call is exempt*

17   *from the TSR as long as the telemarketer is not attempting to induce the retail sale of non-durable*

18   *office or cleaning supplies*.  There is nothing in the published notices accompanying the TSR

19   rulemaking process evidencing a clearly expressed administrative intent to the contrary, and

20   according the language of the TSR its plain meaning does not lead to an absurd result.   The

21   foregoing interpretation is therefore proper as a matter of law.

22        The TSR facially excludes PBS from its scope.  PBS only calls businesses.  (<u>See</u> Dirk

23   Decl. at ¶10.)  In fact, PBS goes to great lengths to ensure that it only calls businesses by paying

24   approximately $25,000 a month for Dun & Bradstreet lead cards containing contact information

25   exclusively for businesses.  (<u>See</u> <u>id.</u> at ¶12-14.)  PBS sells only magazines, and does not sell

26   nondurable office or cleaning supplies.  (<u>See</u> <u>id.</u> at ¶10; <u>see also</u> FTC's Response to Defendants'

27   Request for Admission No. 5, attached hereto as Exhibit F.)  Accordingly, this Court should grant

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   summary judgment in Defendants' favor on all Counts of the Complaint alleging violations of the

2   TSR—that rule simply does not apply.

3          **2.     The FTC's Anticipated Interpretation of the TSR Exemption is
               Contrary to its Plain Language**

4

5          Defendants anticipate that the FTC will oppose this motion by interpreting section

6   310.6(b)(7) in a manner inconsistent with its plain language.  The FTC is likely to argue that

7   application of the exemption depends on whether a telemarketer sells goods or services to the

8   business, or to an individual at his place of business.  (See FTC's Memorandum of Points and

9   Authorities in Support of Plaintiff's Application for Temporary Restraining Order and Order to

10  Show Cause Why a Preliminary Injunction Should Not Issue, n.82, [Doc. #4] (arguing that the

11  "exemption does not shield Defendants because Defendants are selling their magazine

12  subscriptions to *consumers at their place of business* (including delivery of magazine

13  subscriptions to the consumers' *home* addresses), not to the businesses themselves"[27]).

14  According to the FTC, telemarketing calls to businesses where the person answering the phone

15  purchases goods or services on behalf of the business are exempt, while telemarketing calls to

16  businesses where the person answering the phone desires to purchase goods or services for

17  himself or herself are not exempt.  There are at least two problems with this argument: (1) the

18  plain language of section 310.6(b)(7) doesn't support it; and (2) as a practical matter, such a

19  reading of the exemption is unworkable and unfair.

20         The broad language of section 310.6(b)(7) exempts telephone *calls* from telemarketers to

21  businesses.  Nothing in the exemption requires a telemarketer to *sell* exclusively to the business

22  entity.  Indeed, application of the exemption does not hinge upon whether the person answering

23  ---

[27] The FTC's argument has two unsupportable assumptions: (1) that PBS calls businesses but
only sells magazine subscriptions to individuals, not to the businesses themselves; and (2) that
PBS calls businesses with the intent of only selling magazines to individuals.  As set forth in Dirk
Dantuma's declaration, these assumptions are not true.   Approximately one-third of PBS's
customers are businesses.  Unless the person answering the business phone instructs PBS to send
magazines to an alternative address, magazines are shipped to the business address.  Moreover,
while there is no intent element in the exemption, PBS would prefer to have all of its customers
be businesses because businesses typically are more reliable in making timely payments.
Nevertheless, if the person answering the business phone desires to have magazines sent to his or
her home or some other address, PBS will honor the request.  (See Dirk Decl. at ¶16-18.)

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

the business's phone purchases goods or services for the business, whether the goods were shipped to a business or residential address, whether the goods or services are paid for using a business or personal financial account, or whether a donation to a charitable organization is made in the name of the business or the individual answering the phone.  As long as a telemarketer places a call to a business to sell goods or services, and the telemarketer is not selling non-durable office or cleaning supplies, the call is exempt from the TSR.

Section 310.6(b)(7) provides a bright-line rule, making it clear for telemarketers to identify what calls are exempt from, or subject to, the TSR.  Telemarketers who do not sell non-durable office or cleaning supplies know that if they place a call to a business, that call is not subject to the TSR.  These telemarketers also know that because the call is to a business, there is no risk that the number dialed is on the National "Do-Not-Call" Registry, which pertains only to home and personal cell phone numbers.[28]

The FTC's interpretation of the exemption obscures the bright line and imposes an unwarranted obligation on the telemarketer.  For example, not every telemarketing call results in a sale.  If a telemarketer calls a business and the person answering the phone declines the offer, was that call subject to the TSR?  Since no purchase was made, the FTC's distinction about the identity of the purchaser is unavailing.  Under the FTC's line of reasoning, the answer would depend on whether the person answering the phone listened to the sales presentation on behalf of the business or as an individual.  Determining the answer to that question, especially in a large-scale operation, is virtually impossible.

Even if a telemarketer sells goods or services during the call, it is not always clear whether the business or an individual purchased the goods or services.  For example, perhaps a business owner directs that the magazines be shipped to the business, but pays for the magazines with funds from his personal checking account or credit card, and takes the magazines home to read them.  Is that call subject to the TSR?  What if the person answering the phone pays for the

---

[28] The National Do Not Call Registry gives consumers a choice to limit the telemarketing calls they receive at home or on their personal cell phones.  Once a consumer registers his personal phone numbers, telemarketers can no longer call those numbers.  Business phone numbers cannot be placed on the National Do Not Call Registry because calls to businesses are exempt under the TSR.  (See Federal Trade Commission's "Q&A: The National Do Not Call Registry", attached hereto as Exhibit G at ¶14.)

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   magazines using funds from a business account, but has the magazines shipped to a residential

2   address because, unbeknownst to the telemarketer, she wants to preview the magazines before

3   placing them in the waiting room at work?  Is that call subject to the TSR?  What if a telemarketer

4   calls a business owner who operates out of his home and wants magazines sent to his

5   home/business address?  What if a business purchases a magazine subscription as a gift for a

6   client and has the magazines sent to the client's address?  The list of hypothetical scenarios goes

7   on and on.

8          The bottom line is that under the FTC's interpretation, whether a call is exempt under

9   Section 310.6(b)(7) depends on a backward-looking factual analysis to determine whether "the

10  business" participated in a telemarketing call or "an individual at his place of business"

11  participated in a telemarketing call.  Such an analysis would necessarily entail delving into the

12  intent of the person answering the business's phone, the source of payment, the shipment

13  location, and the name of the customer, to name just a few.  Even if these facts could be

14  discovered, a telemarketer would then have the burden of interpreting those facts and making a

15  subjective judgment as to whether the TSR applied to any given call.  Nothing in the TSR

16  requires such an impractical analysis.  In this case, failing to apply the plain meaning of Section

17  310.6(b)(7) leads to an absurd result.

18         The only analysis required by the exemption is the bright-line test set forth in its plain

19  language: Is the telemarketer placing a call to a business, and is the telemarketer attempting to

20  induce the retail sale of non-durable office or cleaning supplies?  This analysis is easy and clear

21  and can be accomplished before the telemarketer even dials the business's phone number.

22  Requiring telemarketers to determine whether the business, or an individual at his place of

23  business, has participated in a telemarketing call is both unworkable and unfair to telemarketers,

24  who could never be certain whether or not they were complying with the TSR.

25         **3.      PBS Complies With the TSR Even Though It Is Exempt From It.**

26         PBS complies with the TSR even though it is not required to.  Counts III through VI of

27  the Amended Complaint respectively allege that PBS violates the TSR by failing to disclose the

28  purpose of the call; misrepresenting the total cost of the magazines; inducing payment by

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

misrepresentation; and engaging in a pattern of abusive calls.  Each of these counts fail.   Just as PBS's truthful business practices comply with Section 5 of the FTC Act (which actually does apply), they also satisfy the requirements of the inapplicable TSR.

a.   <u>PBS discloses the purpose of its call.</u>

16 C.F.R. § 310.4(d) requires telemarketers making outbound calls for the purpose of selling goods to,

> disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, (1) The identity of the seller; (2) That the purpose of the call is to sell goods or services; (3) The nature of the goods or services; and (4) That no purchase or payment is necessary to be able to win a prize or participation in a prize promotion if a prize promotion is offered.

PBS does all these things.  First, PBS's identity is clearly disclosed.  The very first words of the lead call are: "Hi this is _____ with Publishers Business Service."   (See Exhibit 2 to Jeff Decl.)  Second, PBS promptly and clearly discloses that the call is being made for the purpose of selling magazines.   Indeed, as any reasonable customer realizes, the core purposes of the lead call are to arrange for customers to receive their choice of magazines and to explain how they will be billed for those magazines.  The fact that the lead call begins with a few questions to determine whether the potential customer is creditworthy does not change the fact that, taken in context, the lead call unmistakably communicates to customers that PBS is selling magazines.  In any event, the statement preceding the qualifying questions—"if you can help me we have a small surprise for you, nothing big, but it's nice"— leaves no doubt in the mind of a reasonable customer that there is something more to come after the qualifying questions.  That "something" is the opportunity to purchase low-cost magazine subscriptions, the terms of which PBS fully discloses – both orally and in writing – before the customer makes its first payment.

The final provision of Section 310.4(d) is inapplicable because PBS does not offer prizes. PBS lets its customers know who it is, what is it is selling, and the terms of the sale in the lead call.  This is exactly the sort of prompt and conspicuous disclosure the TSR requires.

b.   <u>PBS truthfully represents the total cost of the magazines, and how it collects payment.</u>

Because they are closely related, Counts IV and V are treated together here.  16 C.F.R. §

310.3(a)(2)(i), the subject of Count IV, prohibits telemarketers from "misrepresenting, directly or by implication, in the sale of goods or services…: (i) The total costs to purchase, receive, or use, and the quantity of any goods or services that are the subject of a sales offer." 16 C.F.R. § 310.3(a)(4), the basis of Count V, prohibits telemarketers from "making a false or misleading statement to induce any person to pay for goods or services." PBS fully complies with both provisions.

It is no mystery that PBS's customers will receive seven magazines for a term of sixty months, and will be charged $29.90 for the first twenty-four months of their subscription, and nothing for the last thirty-six months—PBS discloses that in the lead call—and then again in the verification call. After two discussions about the magazines the customer is purchasing, there can be no mistake about the cost and quantity of magazines.

If the FTC means to imply that PBS's truthful statement that the magazines cost only $2.76 per week violates the TSR, it does not. The magazines <u>do</u> cost $2.76 per week, but immediately after stating the weekly cost, the salesperson tells customers that it does not collect payments on a weekly basis, because doing so would be a nuisance; instead, payments are collected monthly. The supervisor then describes the billing arrangements in detail, disclosing that $29.90 will be due for the first twenty-four months of the subscription, with no charges during the last thirty-six moths of the subscription. According to the FTC's own "Complying with the Telemarketing Sales Rule" pamphlet, as long as the number and amount of a customer's payments correlate to the telemarketer's billing schedule, "disclosing the total number of installment payments and the amount of each payment satisfies" the "total cost" disclosure requirement. (<u>See</u> Complying with the Telemarketing Sales Rule, attached hereto as Exhibit H, at 15.)

PBS neither makes false statements about the cost of the magazines, nor does it permit its customers to believe they will be billed on a weekly basis. Customers know how many magazines they are receiving, and how much and for how long they will be billed.

- 28 -

c.   <u>PBS's business rules strictly limit the number of times a customer may be contacted.</u>

16 C.F.R. § 310.4(b)(1)(i) states that it is an abusive telemarketing practice to "caus[e] any telephone to ring, or engag[e] any person in telephone conversation, repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number."

PBS requires all its employees to respect their customers' wishes and privacy. It is a violation of PBS's company policy for a collector to use abusive language, harass customers, or threaten customers with legal proceedings or adverse credit repercussions. PBS utilizes a computer system that tracks collectors' calls to customers on any given day and prevents collectors from calling non-answering customers multiple times a day. Once a collector speaks with a customer, a hold is placed on the account for a certain period of time depending on the outcome of the call to make sure the customer is not bothered. An employee's violation of these rules is grounds for dismissal. Deference and respect characterize PBS's interactions with its customers; abuse and harassment do not. There is no violation of the TSR.

## IV.   **CONCLUSION**

PBS fully complies with applicable and even inapplicable laws. PBS is truthful with its customers that it sells magazines and the terms upon which it sells them. No reasonable customer is misled, and there is no violation of Section 5. Furthermore, even though PBS is exempt from compliance with the TSR, it complies with the rule anyway as a matter of sound business practice. The FTC's proffered "evidence" is statistically insignificant, unreliable, and insufficient as a matter of law to create a genuine issue of material fact. Under <u>Celotex</u>, this is a classic case for disposition on summary judgment. Defendants therefore respectfully move the Court to enter summary judgment in their favor on all Counts of the Amended Complaint.

DATED:  July 31, 2009                SNELL & WILMER L.L.P.

By: _____
Jeffrey Willis, Esq.
Brian R. Reeve, Esq.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
Attorneys for All Defendants

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2009, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel in this matter, all counsel being registered to receive Electronic Filing.

_An Employee of Snell & Wilmer_

10324000