1

2

3

4

5                    UNITED STATES DISTRICT COURT

                          DISTRICT OF NEVADA

6                              * * *
                                )
7    FEDERAL TRADE COMMISSION,   )
                                )
8              Plaintiff,        )        2:08-CV-00620-PMP-PAL
                                )
9    v.                          )
                                )        ORDER
10   PUBLISHERS BUSINESS SERVICES,  )
     INC., et al.,               )
11                               )
               Defendants.       )
12 ─────────────────────────────)

13           Presently before the Court is Plaintiff the Federal Trade Commission's ("FTC")

14   Motion for Summary Judgment (Doc. #86), filed on July 31, 2009.  Defendants filed an

15   Opposition (Doc. #131) on November 23, 2009.  Plaintiff filed a Reply (Doc. #145) on

16   December 7, 2009.

17           Also before the Court is Defendants' Motion for Summary Judgment (Doc. #99),

18   filed on July 31, 2009.  Plaintiff filed an Opposition (Doc. #134) on November 23, 2009.

19   Plaintiff also filed Evidentiary Objections to Defendants' Motion (Doc. #139) on November

20   23, 2009.  Defendants filed a Reply (Doc. #144) on December 7, 2009.

21   **I. BACKGROUND**

22       **A.  The Defendants**

23           Edward Dantuma ("Edward")[1] is the President and owner of Ed Dantuma

24

25   _____

26       [1] Due to the fact that Defendants share the last name "Dantuma," the Court
     hereinafter will refer to them by their first names.

1

1  Enterprises ("EDE"), a magazine subscription sales business.  (FTC SJ Ex. 10 at 11, Ex. 8

2  at 107-08.)[2]  EDE operates under the trade names Publishers Direct Service ("PDS") and

3  Publishers Business Services ("PBS").  (FTC SJ Ex. 2 at 1-2. )  Initially, Edward sold

4  magazines under the name PDS.  (FTC SJ Ex. 10 at 74-75.)  When Edward decided to start

5  selling magazines to businesses, he stopped selling under PDS and incorporated the name

6  PBS.  (Id.)  PBS maintains offices in Altamonte Springs, Florida, Miami, Florida, and

7  Toledo, Ohio.  (FTC SJ Ex. 2 at 2-3.)  PBS also maintains a "virtual office" in Henderson,

8  Nevada.  (FTC TRO Vol. 4 at 589.)[3]

9      Along with his wife, Persis, Edward's four children, Jeff, Dirk, Dries, and Brenda

10  Dantuma Schang ("Brenda") participate in the family business.  (Defs.' Mot. Summ. J.

11  ["Defs.' Mot."] (Doc. #99), Ex. A at ¶ 7.)  Persis manages PBS's and PDS's records.  (FTC

12  SJ Ex. 8 at 104.)  Jeff is in charge of the companies' sales departments in Altamonte

13  Springs and Toledo.  (Id. at 106).  Dirk handles the more serious customer complaints, as

14  well as making sure the companies' sales and collections scripts are in compliance with the

---

[2]  During the nearly four and a half months consumed by briefing of the cross-motions for summary judgment, the parties made fifty-four separate filings, including voluminous exhibits, and a variety of unnecessary evidentiary objections for the Court's consideration.

The FTC labeled its exhibits to its Summary Judgment Motion, including those in support of FTC's Opposition to PBS's Summary Judgment Motion, in consecutive numerical order.  FTC SJ Exs. 1-42 can be found in Declaration Regarding FTC's Motion for Summary Judgment (Doc. #92-97, #100, & #102-04).  FTC SJ Exs. 43-47 can be found in Sealed Notice of Manual Filing (Doc. #87).  FTC SJ Exs. 48-69 can be found in Declaration Regarding FTC's Motion for Summary Judgment & FTC's Opposition to PBS's Motion for Summary Judgment (Doc. #135-138).  Hereafter, the Court will refer to the exhibits as "FTC SJ Ex." with the exhibit number as the FTC has labeled them.

[3]  The FTC filed its exhibits in support of Plaintiff's Motion for a Temporary Restraining Order in four separate volumes.  Volume one can be found at Doc. #5.  Volume 2 can be found at Doc. #6.  Volume three can be found at Doc. #7.  Volume four can be found at Doc. #19.  The Court hereafter will refer to the exhibits as "FTC TRO" and the corresponding volume number.

law.  (Id. at 39-41.)  Dries is in charge of the companies' verification, collections, and customer service departments, all located at the Altamonte Springs office.  (FTC SJ Ex. 9 at 26, Ex. 10 at 53-54.)  Brenda is in charge of the companies' Miami sales office, accounts payable, and correspondence with the magazine publishers.  (FTC SJ Ex. 13 at 18-19.)

**B.  The PBS Process**

PBS offers two different types of magazine subscriptions: Paid by Subscription orders and Single Order Subscription ("SOS") orders.  (Defs.' Mot., Ex. C at ¶ 5.)  Paid by Subscription orders are multiple subscriptions usually consisting of between five and seven different magazines and lasting sixty months.  (Id. at ¶ 6.)  The customer typically pays for the order over a period of months.  (Id. at ¶ 6.)  An SOS order consists of just one magazine and the customer pays for the entire amount of the subscription up front.  (Id. at ¶ 8.)

For Paid by Subscription orders, PBS implements a two stage telemarketing process (1) the lead call and (2) the verification call.  (Defs.' Mot., Ex. C at ¶ 11.)  In the lead call, the sales representative uses a "lead card," which PBS obtains from Dun & Bradstreet, that contains the name, telephone number, and address of a business.  (FTC SJ Ex. 10 at 78-79; Ex. 42, Attach. 4.)  The lead card also contains the name of a contact person for the business.  (FTC SJ Ex. 10 at 79.)  However, PBS permits the sales representative to sell to anyone who answers the phone.  (FTC SJ Ex. 11 at 54.)

For each call, PBS directs the sales representative to follow a marketing script word for word.  (Defs.' Mot., Ex. B at ¶ 10; see also FTC SJ Exs. 17-18.)  The script states the following:

> This is ____ with Publishers Business Service to whom am I speaking with please?  Hi ____, we have been asked to contact a few business people in your area and I just wanted to ask you a few questions on your personal buying habits and if you could help me we have a small surprise for you, nothing big but it's nice, how long have you been employed at ____ more or less than 1 year?  Now just for our advertisers information, may I ask your age & what you do at ____?  What do you most often use money order, credit card, or check?  Ok, __ __, I want to thank you for helping me and with our best wishes you

3

1    will

2    ///

3    ///

     receive the next 60 issues of:[4]
             (Man) = Mens Journal, Car & Driver, Inc., and also for your
     enjoyment Woman's Day and Rolling Stone
             (Woman) = Bon Appetit, Men's Journal, Woman's Day and
     also for your enjoyment Rolling Stone and Elle.
             Now, let me assure you that there is no catch involved,
     however, there is a sound business reason behind the whole thing.  The
     advertisers have authorized us to send the magazines I mentioned to
     assure them that their ads will be read.  Now, you will receive a
     guarantee stating that everything I am promising you is correct, and we
     will be mailing this to you, do you want me to mail it to your home or
     business address? . . .
             Now we're not going to ask you to buy any cash subscriptions
     or anything like that.  The only thing we have been asking people like
     yourself is to thank us in return by helping to defray the cost of getting
     them out to you, and I'm sure that you wouldn't mind that because it's
     only $2 dollars and 76 cents a week which covers all 5 of the
     publications and there is absolutely no other charge, and it's payable
     by the month, most people I've talked to today have been more than
     happy to go along with this and I'm sure that you too will agree that 5
     magazines is quite a lot for just $2 dollars and 76 cents a week right!
             Now we don't collect the $2 dollars and 76 cents each week,
     that would be sort of a nuisance, so what we do is send you a small
     supply of self-addressed envelopes and you can send it in by our
     monthly honor plan, or faster if you like.  Most people send it in two
     months at a time since it is such a small amount, and, you will receive
     a written guarantee to assure you what I have told you is correct, now,
     just in case we cannot contact you at work, do you have another phone
     number we can reach you at.
             And also ____, for all the people who are taking advantage of
     our offer today, we are sending out the Go & Lucky to your business at
     no extra charge, hold for one second ___, my supervisor would like to
     verify some information with you.....

     (Defs.' Mot., Ex. C, Attach. 1.)[5]

     The sales representative then transfers the customer to the shift supervisor.  (Id.,

     _____

     [4]  The magazines offered differ depending on the magazines' remit rates at the time.
     (FTC SJ Ex. 8 at 102.)

     [5]  PBS sometimes modifies its scripts, but the same basic information appears in all
     the scripts.  (FTC SJ Ex. 42, Attachs. 5-7.)

Ex. C at ¶ 16.)  The shift supervisor also follows a script:

> Hi Mr./Mrs. ____, I just wanted to take a moment to double check all of the information we have on your order to make sure everything is correct.  Now I see that you want these to go to your *Business/Home* address at *read address* and you are *age* and *occupation* and you use *check/credit card* most often.
>
> Now just as *name* told you , it's all 7 publications for just $2.76 cents a week, which is 11.96 a month, now instead of paying 11.96 each month for the full 60 months, we ask that you send it in two months at a time, which is 29.90 a month for the first 24 and nothing the remaining 36 months, do you see how that works?...
>
> Ok ____, to guarantee these low rates, I'll lock in the price right now and we will be calling you back shortly to confirm this with you. Now do you have any questions concerning your order Mr./Mrs. ____, thanks again, and we know that you will enjoy the publications. Bye.

(Id., Ex. C, Attach. 3.)  At the end of the lead call, the shift supervisor notifies

the customer that he or she will receive another call in the near future to confirm the

order.  (Id., Ex. C at ¶ 17.)

In their depositions, Dirk, Edward and Brenda explain the meaning of certain

statements in the script.  For example, despite what the script says, PBS does not actually

provide the information it gathers from customers to advertisers.  (FTC SJ Ex. 8 at 71-72.)

The statement "helping to defray the cost of getting them out to you" refers to the cost of

the magazine subscription, not the cost of shipping.  (Id. at 198.)  The statement "cash

subscriptions," Edward explains, is in reference to subscriptions where the publisher

requires the consumer to pay for the subscriptions up front.  (FTC SJ Ex. 10 at 127.)  The

statement "monthly honor plan" refers to a plan where the consumer makes monthly

payments.  (FTC SJ Ex. 14 at 148.)

Although PBS instructs its employees to follow the script, former PBS employees

heard other representatives routinely deviate from the script.  (FTC SJ Ex. 17 at ¶ 14, Ex. 18

at ¶ 13-14, Ex. 19 at ¶ 14.)  One former PBS sales representative personally recounted that

deviating from the script often resulted in higher sales.  (FTC SJ Ex. 18 at ¶ 14.)  According

to another former PBS sales representative, in the Miami office, experienced sales

representatives (those who had been with PBS six months or longer) were encouraged to deviate from the script and were assigned to private sales rooms to separate them from the newer sales representatives. (FTC SJ Ex. 19 at ¶ 14.) In the Altamonte Springs office, another former sales representative recounted that occasionally the supervisor would tell the employees that there had been a lot of customer complaints and that the salespeople needed to stick to the script. (FTC SJ Ex. 17 at ¶ 15.) However, the same employee noted that she never had heard of anyone being disciplined for deviating from the script. (Id. at ¶ 15; see also FTC SJ Ex. 19 at ¶ 22 (a different employee had a similar experience in the Miami office).)

The sales department does not have a rebuttal script. (FTC SJ Ex. 66 at 61.) Instead, employees are directed to end the phone call if the customer is not interested. (Id., FTC SJ Ex. 17 at ¶ 10.) One former PBS sales representative, Shadiayah Aljubailah ("Aljubailah"), explains that if a customer said they were busy, she was instructed to put the card in the "call-back" pile. (FTC SJ Ex. 15 at ¶ 9.) According to Aljubailah, if the customer did not want to receive any more calls from PBS, she was instructed to put the card in the same "call-back" pile. (Id.) Another former sales representative, Nichole Golden ("Golden"), avers that her supervisor told her the cards in the "call-back" pile were considered hotter leads because the first call had confirmed the business was open. (FTC SJ Ex. 17 at ¶ 8.) Golden was instructed to call the same businesses repeatedly because even though the person who initially answered the phone declined, someone else might agree to the offer on a subsequent call. (Id.) However, according to Jeff Dantuma, PBS sales representatives are authorized to call a business more than once only if no one answers the first time. (Defs.' Opp'n to FTC's Mot. Summ. J. ["Defs.' Opp'n"], Ex. D at ¶ 14.)

During the second phase of the process, a "verifier" calls the customer to confirm the order. (Defs.' Mot., Ex. B at ¶ 17.) Verifiers use the following script:

> Hi, Is this Mr./Mrs. ____? This is ____, the new account

manager with Publishers Business Services.  I'm just calling to thank you for doing the survey and the maga[z]ine order with us a little while ago, and I just need to quickly tape verify the information with you ok? **(TURN TAPE ON)** Can you hear me ok Mr./Mrs. <u>(Full Name)</u>?  **We are now on tape and I do have your permission correct? (WAIT FOR RESPONSE)**

Today is <u>(Date)</u> and we processed your order on <u>(Date)</u>.  We will be mailing these to <u>Address</u>.  Your order calls for <u>(Read Magazines)</u>.  Your payment plan and total cost as explained to you and also listed on your order will be $____/per month for only the first ____ months and you will pay nothing the remaining ____ months.  Do you understand how that works Mr./Mrs. ____? **(WAIT FOR RESPONSE)**

**It does cost our company a great deal of time and money to enter the order for you, and because of this we do ask that you will take the magazines for the full term and make the monthly payments as agreed.  This order cannot be cancelled during the term of the agreement, however it will cancel automatically after that, is that acceptable to you Mr./Mrs. ____? (WAIT FOR RESPONSE)** Now it does take approximately 8-10 weeks to get your services started.  And just to quickly review your credit information, I see that you are <u>(Age)</u> and a <u>(Occupation)</u> at <u>(Business)</u>.

**(If they are not the owners, ask the following)**
And how long have you been employed at <u>(Business)</u> ?  And would you say that your monthly income is more than $1,000 per month? **(WAIT FOR RESPONSE)** And your home phone # is <u>(Read Home Phone)</u> (If none listed ask; Do you have another # we can reach you at?)***(**INFORMATION REQUIRED**)***

**(If it is going to a residence)**
Are you renting, buying or living with family?  Are you married or single? **(If Married)** May I have your spouse's name?  How long have you lived at your residence?

Okay, Mr./Mrs ____.  How will you be making payments on this by credit or checking account? . . . That's fine, we will send out a monthly statement and an envelope for mailing in your payments.  You will receive you[r] first statement within two weeks.  Can you mail that back to us by <u>(Date)</u>?  **(WAIT FOR RESPONSE)** Now I've done all the talking, do you have any questions at this time Mr./Mrs. ____? . . .

(<u>Id.</u>, Attach. 5.)

Kristen Cholewin ("Cholewin"), a former PDS verifier, worked for PDS for about a month at the end of 2005.  (FTC SJ Ex. 16 at ¶ 2.)  Cholewin explains that although she was given a script to follow word for word, she never heard of anyone being fired for deviating from the script.  (<u>Id.</u> at ¶¶ 8, 32.)  As training, the supervisor made a few verification calls in Cholewin's presence.  (<u>Id.</u> at ¶ 7.)  Ms. Cholewin had a quota of tape

7

1   verifications that she needed to complete in a day.  (Id. at ¶ 17.)  Cholewin recounts that

2   verifiers were fired for not making their numbers and for generally giving up easily when a

3   customer would say that they did not want the magazines.  (Id. at ¶ 32.)

4        Verifiers would receive sales slips filled out by the sales department containing the

5   customer's name, phone number, and the list of magazines ordered.  (Id. at ¶ 7.)  According

6   to Cholewin, the verifiers were to write on the sales slips what happened on the call.  (Id. at

7   ¶ 18.)  If the customer said no to the magazines, Cholewin was instructed to draw a large

8   "X" across the order slip to indicate the customer's refusal.  (Id.)  The verifiers were

9   strongly discouraged from marking an order with an "X."  (Id. at ¶¶ 18, 22.)  Because of the

10  pressure to keep refusal slips to a minimum, Cholewin put "refusal" sales slips back in the

11  call back pile instead of marking them with an "X."  (Id. at ¶ 19.)  Cholewin believes other

12  verifiers were doing this as well because she had at least ten to fifteen calls per day where

13  the customer would tell her that they already had received numerous calls from PBS at

14  which time they told the representative they were refusing the magazines.  (Id.)  Cholewin

15  did not receive training on how to deal with "do-not-call requests."  (Id. at ¶ 21.)

16        Cholewin also explains that verifiers were given a "rebuttals" script containing

17  answers to frequently asked questions.  (Id. at ¶ 14.)  For example, if a customer asks about

18  the total cost of the subscription, Cholewin was instructed to repeat the weekly and monthly

19  price as stated in the script, and to avoid telling the customer the total price if possible.  (Id.)

20  However, Dirk testified that although the instruction is not written down, verifiers are

21  directed to tell the customer the total price of the magazines if asked.  (FTC SJ Ex. 64 at

22  209.)

23        PBS runs monthly reports that detail how many complaints each salesperson

24  received.  (FTC SJ Ex. 9 at 82-83.)  If a salesperson's complaints are out of the norm, as

25  compared to the other salespeople, Dries will review the salesperson's verification tapes.

26  (FTC SJ Ex. 9 at 84-85.)  At his deposition, Dries testified that if he finds that the

1  salesperson is not following the script, she receives a warning, and if it happens a second

2  time she is fired.  (Id. at 82.)  Later in Dries' deposition, Dries testified that if he finds on

3  the tape that the salesperson is not following the script, or she is doing the order improperly,

4  she is fired immediately.  (Id. at 85.)

5          If a customer calls and complains that they did not agree to the order, the

6  customer service representative is directed to check the verification tape.  (FTC SJ Ex. 65 at

7  88.)  If the tape reveals the verification was done incorrectly, the order is cancelled and put

8  in the "bad tapes report."  (FTC SJ Ex. 65 at 88.)  The FTC highlights four PBS verifiers

9  who had numerous "bad tape reports" and as of June 10, 2008 were listed as current PBS

10  employees.  (FTC SJ Ex. 42, Attach. 18-22 & 25.)  For example, between August 2005 and

11  April 2008, Bianca Gonzalez incorrectly explained PBS's cancellation policy or did not

12  clearly inform customers that they were entering into a commitment to purchase magazines

13  twenty-one times.  (Id. at 948, 950, 952-957, 959, 963, 966.)  Between April 2006 and June

14  2007, Ashley Fulford processed orders notwithstanding the customers' statements that they

15  did not agree to purchase the subscription or she did not inform the customer about the

16  company's cancellation policy thirty times.  (FTC SJ Ex. 42, Attach. 19 at 968, 970-979.)

17  Between July 2006 and February 2007, Yolanda Woodbury ("Woodbury") did not clearly

18  inform customers of PBS's cancellation policy or processed the order as complete even

19  where the customers stated they were not agreeing to purchase the magazines twenty-eight

20  times.  (Id., Attach. 21 at 987-995.)  On December 12, 2006, an account was cancelled after

21  Dries listened to the verification tape and found Woodbury was evasive and was not

22  consistent in her responses to the customer's questions.  (Id. at 992.)  Between July 2005

23  and August 2007, Renee Spagnol's ("Spagnol") verification recordings either cut off at

24  crucial points where the customer is supposed to agree to the subscription terms, or when

25  the customer started to ask a question, or Spagnol did not accurately inform the customer of

26  the terms of the offer fifty-three times.  (FTC SJ Ex. 42, Attach. 22 at 998-1000, 1003-20.)

1  In one instance, Spagnol continued the verification even after the customer hung up the

2  phone.  (<u>Id.</u> at 1009.)  Spagnol later was promoted to the position of verification supervisor.

3  (FTC SJ Ex. 9 at 216.)

4        After the verification call, PBS sends a written invoice to the customer containing

5  information on the price of the subscription, the length of the subscription, the terms of the

6  agreement, and the non-cancellation policy.  (Defs.' Mot., Ex. B, Attach. 8.)  PBS also

7  sends a "First Payment Coupon," which Defendants ask the consumer to fill out and return

8  along with their first payment.  (FTC SJ Ex. 42, Attach. 13.)  The First Payment Coupons

9  ask the consumer to rate PBS and give the consumer three possible rating choices:

10  excellent, good, and fair.  (FTC SJ Ex. 42, Attach. 13.)

11        PBS implements an "internal control period" of ten business days before

12  processing the order with the publishers, within which time the customer may cancel.

13  (Defs.' Mot., Ex. B at ¶ 23.)  According to Dries and Brenda, if a customer contacts PBS

14  within the internal control period and asks to cancel for any reason, PBS honors the request

15  without question.  (<u>Id.</u>; FTC SJ Ex. 63 at 181.)  However, unless the customer lives in a

16  buyer's right to cancel state, PBS does not notify the customer of this cancellation period.

17  (FTC SJ Ex. 64 at 57.)

18        In the event a customer does not pay for the magazines after PBS places the order

19  with the publishers, a PBS collector will attempt to collect on the unpaid account.  (Defs.'

20  Mot., Ex. B at ¶ 31.)  PBS does not hire outside collection companies, nor does it report

21  delinquent accounts to the credit bureaus or initiate legal proceedings against customers

22  with delinquent accounts.  (<u>Id.</u>)  In attempting to collect, PBS collections agents call the

23  customer and send out invoices.  (FTC SJ Ex. 8 at 217, Ex. 9 at 142-43.)  PBS also sends

24  out letters under the names of fictitious people, with certain names corresponding to the

25  length of delinquency.  (FTC SJ Ex. 9 at 143-45.)  For example, if the customer is three

26  months delinquent he or she receives a letter from "James Laurence."  (<u>Id.</u> at 144).  If the

customer is four months delinquent he or she receives a letter from "John Carlton" which informs the customer that if he or she "fails to pay this account in full, we will move forward reviewing our rights against you for all monies due plus interests and costs, as provided by the agreement."  (Id. at 144-45, Ex. 59, Attach. 4.)  The customer receives a letter from "Bob Callahan" if he or she is six or seven months delinquent.  (FTC SJ Ex. 9 at 145.)  The letter identifies Bob Callahan as part of PBS's legal department, however PBS does not have a legal department.  (FTC TRO Vol. 1 at 81; FTC SJ Ex. 9 at 156.)

According to Dries, once a PBS collection agent speaks to a customer, a "hold" is placed on the account for a certain period of time.  (Defs.' Mot., Ex. B at ¶ 34.)  During the hold period, PBS does not contact the customer.  (Id.)  Typically the hold is between ten and fifteen days; however, if the customer refuses to pay, the collector is not authorized to call that customer and the customer is sent to the customer service department for resolution.  (Id.)  Edward testified that it is against PBS's company policy for collections agents to threaten customers.  (FTC SJ Ex. 10 at 31-32.)  Additionally, according to Dries, PBS maintains an internal "do-not-call" list and will cancel the account if they cannot resolve the customer's concerns.  (Id. at ¶ 38.)

While PBS has the ability to monitor employees' calls, Brenda only monitors calls at the Miami office when she is on location, which is approximately twice a year. (FTC SJ Ex. 8 at 228-29, Ex. 63 at 126-27.)  Jeff monitors calls at the Altamonte Springs office, but he only monitors what the employee, not the customer, is saying.  (FTC SJ Ex. 66 at 60.)  According to Edward, however, Jeff, Dries, and several other managers have monitoring equipment that allows them to listen to both ends of the call, and all the calls are closely monitored.  (Defs.' Opp'n, Ex. E at 93-94.)

### C. Complaints & Legal Action

Between January 1, 2004 and August 31, 2008, Defendants made approximately 25 million telemarketing calls and received 1,101 consumer complaints.  (FTC SJ Ex. 4 at

1   5-6.)  Of the 1,101 complaints sent to Defendants, 152 were sent by the consumers'

2   attorneys, 220 were sent by a state Attorney General, and 729 were sent by the Better

3   Business Bureau ("BBB").  (FTC SJ Ex. 42, Attach. 11.)  Between 2000 and 2008, the

4   Federal Trade Commission ("FTC") received approximately 400 consumer complaints

5   about PBS.  (FTC TRO Vol. 3 at 369, Vol. 4 at 536.)  Between May 2005 and May 2008,

6   the Nevada BBB has received 504 complaints from consumers about PBS.  (FTC TRO Vol.

7   1 at 129.)  Between October 12, 2004 and July 11, 2008 consumers submitted 556

8   complaints to the BBB.  (FTC SJ Ex. 42 at ¶ 28.)  It is unclear from the record to what

9   extent there is overlap among consumers complaining to the various agencies.

10   Nevertheless, it is undisputed that consumers have filed hundreds of complaints against

11   Defendants.

12          In addition to complaints to the various agencies or through an attorney,

13   consumers complained on the "First Payment Coupons."  (FTC SJ Ex. 42, Attach. 13.)  Of

14   the approximately 1,537 First Payment Coupons Defendants provided to the FTC in

15   discovery, when rating PBS, 546 customers marked "excellent," 674 customers marked

16   "good," and 317 customers marked "fair."  (Defs.' Opp'n, Ex. A at ¶ 16.)  The FTC

17   attached eighty-four of the First Payment Coupons as exhibits.  (FTC SJ Ex. 42, Attach.

18   13.)  On twenty-three out of eighty-four First Payment coupons, consumers complained

19   about being called at work, that the representative spoke too fast, or that the terms of the

20   offer were not made clear.  (FTC SJ Ex. 42, Attach. 13.)  Some of the consumers who rated

21   PBS as "good" also included written complaints on the First Payment Coupon.  (FTC SJ

22   Ex. 42, Attach. 13 at 875 ("talking to people at work is not a good thing"), 878 ("was

23   rushed need to have changed.  Called me at work"), 883 ("called at work while I was busy

24   took too long"), 887 ("poor timing to call at work"), 891 ("it was as though I was forced

25   into buying magazines" ).)

26          Between January 1, 2004 and August 31, 2008, Defendants collected

$40,456,893.25 from consumers in connection with Paid by Subscription and SOS sales. (FTC SJ Ex. 42, Attach. 9.)  During that same time period, Defendants refunded $265,244.25 to consumers.  (FTC SJ Ex. 42, Attach. 10.)  Additionally, between August 2009 and October 2009, PBS charged approximately $671,958.65 to consumers' credit cards.  (Defs.' Opp'n, Ex, A at ¶ 23.)  Of that, consumers disputed approximately $5,326.99.  (Id.)

Defendants also have been the subject of litigation in several states.[6]  In three states, the Attorney General commenced an action against PDS after receiving complaints that PDS was (1) refusing to allow consumers to cancel subscriptions; (2) failing to inform consumers of their right to cancel;[7] and (3) making telephone sales presentations that were false, deceptive, and contained omissions of material fact.  (FTC TRO Vol. 3 at 456-502.) Defendants subsequently entered into Consent Decrees requiring Defendants to, among other things: (1) disclose all material terms of the offer, including total cost and length of subscription; (2) refrain from making false or misleading statements in telephone sales presentations; and (3) refrain from using abusive language and making threats during collection calls or in collections letters.  (Id. at 456-502.)  The Florida and Texas Attorneys General also investigated Defendants in 2003 and 2007, respectively.  (FTC TRO Vol. 1 at 182, Vol. 2 at 275-78.)

The FTC provided forty-one declarations of PBS consumers, all of whom

---

[6] An Idaho Assurance of Voluntary Compliance, entered March 4, 1991 against PDS. (FTC TRO Vol. 3, Ex. 11.)  A Wisconsin Consent Judgment, entered June 1995 against PDS. (Id., Ex. 12.)  An Illinois Federal Consent Decree, entered March 31, 1998 against PDS and PBS. (Id., Ex. 13.)  The Court hereinafter will refer to the three state orders as Consent Decrees.  In addition, a class action complaint was filed in California in July 2007, Johnson v. Publishers Business Services, Inc., Case No. 2:07-CV-01394.  (Id., Ex. 14.)

[7] Wisconsin and Illinois have state laws requiring a "buyer's right to cancel notice." (FTC TRO Vol. 3, Exs. 12-13.)

complained to either the BBB or the FTC.  (FTC TRO Vol. 1 at 1-112; FTC SJ Exs. 27-40, 48-62.)[8]  Out of all the consumers who provided declarations, seven consumers paid PBS some, if not all, that PBS said they owed.  (FTC SJ Exs. 29, 36, 40, 54, 62; FTC TRO Vol. 1 at 29,[9] 82.[10])  The consumers' complaints regarding PBS, as well as the experiences of former PBS employees, are summarized below.

### 1.  Initial & Verification Calls

Many consumers said the PBS representative spoke rapidly, and that they were confused by the terms of the offer because the PBS representative was speaking so fast. (FTC SJ Exs. 20-23, 25, 29, 40, 50, 54, 57, 61; FTC TRO Vol. 1 at 22, 105.)  Eleven consumers said they were busy at work and distracted when the PBS representative called. (FTC SJ Exs. 20, 30-32, 34, 40, 48, 50, 55; FTC TRO Vol. 1 at 22, 105.)  According to former PDS verifier Cholewin, she was instructed "to talk fast so that the customer would not be able to follow what [she] was saying and would not have time to ask questions." (FTC SJ Ex. 16 at ¶ 28.)  Additionally, two former PBS sales representatives noted that they were more successful selling to stores with younger employees who were busy with their own customers because often they were too busy to listen carefully.  (FTC SJ Ex. 18 at ¶ 16, Ex. 19 at ¶ 24.)

After the initial PBS sales call, seventeen consumers were left with the impression that PBS was offering free magazines.  (FTC SJ Exs. 30-31, 34, 37, 39-40, 50-

---

[8]  Nine of the declarations are parents, spouses, or supervisors of the consumer. (FTC TRO Vol. 1 at 14, 56, 96; FTC SJ Exs. 27-28, 38, 51, 57, 60.)

[9]  PBS reimbursed the consumer $841, the total PBS charged her for the magazines. However, PBS did not reimburse the consumer for the overdraft charges she incurred when PBS withdrew money from her account.  (FTC TRO Vol. 1 at 29, 38-42, 54-55.)

[10]  PBS refunded the consumer $25 of the $125 PBS had charged her.  (FTC TRO Vol. 1 at 82.)

55, 60-62; FTC TRO Vol. 1 at 27 & 101.)  Alternatively, seventeen consumers believed that the magazines were free with a nominal charge for shipping and handling.  (FTC SJ Ex. 20 at 42-43 (one time $24 charge), Ex. 23 (one time $3 charge), Ex. 25, Ex. 29, Ex. 31, Ex. 36 ($18 a month for 6 months), Ex. 57 (less than $10 total); FTC TRO Vol. 1 at 1 ($20), 2, 20 ($24 for the year), 27 ($2 per magazine for 5 years), 62 ($3), 86 (less than $3), 96, 99 (less than $ 3 per magazine), 105, 136.)  Four of the remaining consumers who do not recall being told the magazines were free, nonetheless, recall a total amount different from the actual amount they were charged.  (FTC SJ Ex. 29 ($185 for 5 years), Ex. 48 ($29.90), Ex. 49 (same), Ex. 58 ($31.40).)  In sum, many of the consumers believed the initial conversation represented the entire agreement between them and PBS: that the offer was either free or a nominal amount, and that there was no long-term obligation or no obligation at all.  (FTC SJ Exs. 20-21, 23-24, 26, 29-30, 40; FTC SJ TRO Vol. 1 at 20, 22, 27, 60, 99, 101, 105.)  A number of consumers believed they were not agreeing to accept the magazines or to make any payments, but instead were agreeing to receive written materials on the offer.  (FTC SJ Exs. 20, 22, 24, 32; FTC TRO Vol. 1 at 20, 27.)

During the verification call, when the PBS verifier tells the consumer the purpose of the call is to "verify" information, fifteen consumers believed this to mean that the verifier was just going to confirm the terms previously disclosed in the initial call.  (FTC SJ Exs. 20-21, 24, 26, 29, 30-32, 36, 39, 40; FTC TRO Vol. 1 at 22, 27, 99, 101.)  In several verification recordings, consumers asked questions about whether they would be allowed to review a written offer before committing to the subscriptions, the total price of the magazines, the company's cancellation policy, or a clarification on the length of the subscription term.  (FTC SJ Ex. 42 at ¶ 38, Attach. 8 at 738, 741, 763, 775-76, 803, 812-13.)  In these recordings, the verifier either ignored the consumer's question, responded by repeating parts of the script, or replied that they could not answer the question.  (Id. at 738, 741, 763, 775-76, 803, 812-13.)  In several of the verification recording transcripts, the

verifier told the consumer that they will be paying only for shipping and handling.  (Id. at 747, 771, 803, 822-23.)

Additionally, although many of the verifiers informed the consumer that they could change the magazines at any time, the verifiers did not inform the consumer that it would cost three dollars to change.  (See e.g., id. at 731, 735, 740, 741, 748, 751.)  Cholwein avers she was not instructed to inform customers of the charge and she never heard any employees mention it during their calls.  (FTC SJ Ex. 17 at ¶ 12.)  According to Dirk and Dries, PBS discloses the three dollar charge in the written materials, and customers may change magazines once free of charge.  (FTC SJ Ex. 64 at 208; Defs.' Mot., Ex. B at ¶ 27.)

Some of the consumers' declarations contradict their verification recordings.  For example, one consumer states in her declaration that she told the verifier she did not want the magazines and the verifier told her she could not back out.  (FTC SJ Ex. 52.)  However, the consumer does not say that in the verification recording.  (Defs.' Second Supp. Verification Recordings (Doc. #146), Hall Verification.)  In the declaration of another consumer, the consumer states that the verifier told him the magazines were free but there would be a nominal shipping charge.  (FTC TRO Vol. 1 at 101.)  However, in the verification recording the verifier does not say the magazines are free.  (FTC SJ Ex. 43, Truiano Verification.)  In his deposition, the consumer also admits that, contrary to his declaration, he did not tell the PBS agent that he would not accept the offer until he received the written materials.  (FTC SJ Ex. 20 at 48.)  A third consumer says she understood the total to be eight dollars and ninety seven cents.  (FTC SJ Ex. 57.)  In the verification recording, though the verifier does say "eight ninety seven" without using the word "hundred," she also explains the cost as "twenty-nine ninety" a month.  (Defs.' Second Supp. Verification Recordings, Verification of O'Brien.)  Yet another consumer says he told the verifier he would not agree to anything until he received the written

1   materials.  (FTC TRO Vol. 1 at 101).  However, the consumer never says that in the

2   verification recording.  (FTC SJ Ex. 42, Attach. 8 at 833.)

3           According to Dirk, PBS sufficiently informs the customer of the total cost of the

4   magazines by telling the customer the amount per week or month and the total number of

5   months.  (FTC SJ Ex. 64 at 56.)  Additionally, Dirk states that the total cost is on the written

6   materials and is disclosed to the customer before PBS collects any money.  (Id. at 56.)

7   However, Dirk also notes that PBS uses the recorded verification call, which is placed

8   before the written materials are sent out, to "save an order" by explaining to the customer

9   that they have agreed to the terms on tape.  (FTC SJ Ex. 8 at 214.)

10                          2.  Subsequent Communications

11          After receiving the invoice in the mail from PBS, fourteen of the declaratnts

12  attempted to cancel by either writing "cancel" on the invoice and sending it back to PBS, or

13  contacting PBS via email or telephone.  (FTC SJ Exs. 20-27, 30, 36, 40; FTC TRO Vol. 1 at

14  20, 60, 82, 96.)  Many consumers were told they were not able to cancel because PBS

15  already paid the magazine publishers for the consumers' subscriptions.  (FTC SJ Exs. 20,

16  21, 23; FTC TRO Vol. 1 at 29, 60, 96.)  Dirk admits that even though PBS sells

17  subscriptions to its customers at a five year subscription term, some of the subscriptions

18  have one, two, or three year maximum terms.  (FTC SJ Ex. 8 at 136-37; see also  FTC TRO

19  Vol. 1 at 117; Vol. 2 at 292.)  Because of this, at some point the sales representative will

20  have to renew the subscriptions.  (FTC SJ Ex. 8 at 136-37.)  However, according to Dirk,

21  PBS agents do not inform the customers that in some cases, the entire five year subscription

22  has not been prepaid.  (Id. at 146-47.)  When consumers subsequently complained to an

23  agency like the BBB or FTC, Defendants sent a letter to the agency stating that PBS

24  "thoroughly explained the terms of the order" and that the consumer expressly indicated he

25  or she wanted the magazines, but PBS nonetheless agreed to cancel the order.  (FTC TRO

26  Vol. 1 at 13, 54, 104, 111, 135.)

1        Despite the PBS collections protocol, many consumers aver that PBS collections

2  agents called them at work even after they told the collections agent to stop.  (FTC SJ Exs.

3  20, 23, 49, 55, 60, 62; FTC TRO Vol. 1 at 29, 60, 62.)  Consumers also averred that PBS

4  agents called them numerous times a day.  (FTC SJ Exs. 32, 49, 55, 62; FTC TRO Vol. 1 at

5  1, 29, 60, 62, 82, 105.)  Many of the consumers reported that PBS threatened them.  (FTC

6  SJ Exs. 22, 30, 50, 54, 60; FTC TRO Vol. 1 at 20, 82, 96, 101, 112.)  For example seven

7  consumers said the PBS collections agents threatened to report the consumer to the local

8  credit bureau or collection agency, or that PBS would garnish the consumer's wages.  (FTC

9  SJ Exs. 22, 50; FTC TRO Vol. 1 at 20, 82, 96, 101, 112.)  In addition, five consumers said

10  the collections agents represented themselves as PBS's attorneys or threatened to take the

11  consumer to court.  (FTC SJ Exs. 20, 30, 54; FTC TRO Vol. 1 at 82, 112.)

12      **D.  Procedural History**

13        On May 14, 2008, the FTC filed a Complaint for injunctive and other equitable

14  relief alleging PBS engaged in unfair or deceptive acts or practices in or affecting

15  commerce in violation of Section 5(a) of the Federal Trade Commission Act ("FTC Act"),

16  15 U.S.C. § 45(a), and in violation of the FTC's Telemarketing Sales Rule, 16 C.F.R Part

17  310.  (FTC Compl. (Doc. #1).)  On June 3, 2008, the parties entered into a Stipulated

18  Preliminary Injunction.  (Stipulated Prelim. Inj. (Doc. #25).)  On February 5, 2009, the FTC

19  filed an Amended Complaint (Doc. #62) adding Defendants Dries, Dirk and Jeffrey

20  Dantuma.  The parties completed discovery on May 22, 2009.

21        On July 31, 2009, the parties filed cross motions for summary judgment.  The

22  FTC contends PBS is in violation of the FTC Act, 15 U.S.C. § 45(a),  because PBS makes

23  material misrepresentations to consumers in the initial telemarketing calls and in subsequent

24  communications with consumers.  Additionally, the FTC argues PBS is subject to the

25  Telemarketing Sales Rule, 16 C.F.R. § 310, because it sells to consumers at their place of

26  business.  FTC contends PBS is in violation of the Telemarketing Sales Rule because PBS

1   fails to disclose the purpose of its call to consumers, misrepresents the total cost of the

2   magazine subscriptions, makes false and misleading statements to induce payment for

3   goods, and engages in a pattern of abusive calls.  The FTC seeks a permanent injunction

4   against Defendants, including the individual Defendants, which prohibits them from

5   engaging in telemarketing and the sale of magazines.  The FTC also seeks monetary relief

6   in an amount equal to the Defendants' gross revenues less the amount Defendants have

7   refunded consumers.

8        PBS contends it is not in violation of the FTC Act because all the material

9   representations it makes are true.  Furthermore, PBS argues its non-material commentary

10  would not mislead a customer acting reasonably.  With respect to the Telemarketing Sales

11  Rule, PBS contends the plain language of the business-to-business exemption of the

12  Telemarketing Sales Rule exempts PBS from its requirements.  Nevertheless, PBS argues it

13  complies with the Telemarketing Sales Rule because PBS discloses the purpose of its call,

14  truthfully represents the total cost of the magazines, and strictly limits the number of times a

15  customer may be contacted.

16  **II.  LEGAL STANDARD**

17       Summary judgment is appropriate "if the pleadings, the discovery and disclosure

18  materials on file, and any affidavits show that there is no genuine issue as to any material

19  fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

20  Initially, the moving party bears the burden of proving there is no genuine issue of material

21  fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  If the moving party

22  meets its burden, the burden shifts to the nonmoving party to "set forth specific facts that

23  show a genuine issue for trial."  Id. (internal quotation omitted).  A moving party without

24  the ultimate burden of persuasion at trial "must either produce evidence negating an

25  essential element of the nonmoving party's claim or defense or show that the nonmoving

26  party does not have enough evidence of an essential element to carry its ultimate burden of

1   persuasion at trial." <u>Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.</u>, 210 F.3d 1099,

2   1102 (9th Cir. 2000).  The Court views all evidence in the light most favorable to the

3   non-moving party.  <u>Leisek</u>, 278 F.3d at 898.

4   **III.  DISCUSSION**

5       Section 5 of the FTC Act prohibits "deceptive acts or practices in or affecting

6   commerce."  15 U.S.C. § 45(a).  The FTC enacted the Telemarketing Sales Rule ("TSR") as

7   a result of a directive from Congress to "prescribe rules prohibiting deceptive telemarketing

8   acts or practices and other abusive telemarketing acts or practices."  15 U.S.C. § 1602(a)(1).

9   Any violation of the TSR constitutes an unfair and deceptive act or practice in violation of

10  Section 5 of the FTC Act.  15 U.S.C. § 57a(d)(3), § 6102(c)(b).  The TSR includes a

11  "business-to-business exemption" that exempts from its requirements "[t]elephone calls

12  between a telemarketer and any business, except calls to induce the retail sale of nondurable

13  office or cleaning supplies."  16 C.F.R. § 310.6(b)(7).

14      **A.  The Business-To-Business Exemption to the TSR**

15      PBS contends the plain language of the business-to-business exemption to the

16  TSR exempts PBS from its requirements because PBS only calls businesses.  Additionally,

17  PBS contends the FTC's interpretation of the TSR–that the exemption depends on whether

18  a telemarketer sells to the business rather than an individual–is unworkable and unfair

19  because it would depend on whether the person answering the phone was listening on

20  behalf of the business or as an individual.  PBS contends due process prohibits the FTC

21  from reading in a specialized, non-intuitive meaning, leaving businesses to guess at the

22  scope of the law and the legality of their conduct.

23      The FTC contends PBS does not qualify for the business-to-business exemption

24  to the TSR because they are selling magazines to individual consumers, not businesses.

25  Specifically, FTC argues PBS is a "seller" and "telemarketer" engaged in "telemarketing"

26  to "customers" as those terms are defined by the TSR.  The purpose of the exemption, the

FTC contends, is to generate transactions between businesses.  The FTC argues that interpreting the exemption as PBS suggests would produce an absurd result by protecting consumers from deceptive and abusive calls only if they are called at home.  Furthermore, the FTC argues its interpretation of the business-to-business exemption is consistent with the industry usage of the term, the FTC's published regulatory intent, and congressional intent.

The contains a business-to-business exemption which exempts calls between a telemarketer and a "business."  16 C.F.R. § 310.6(b)(7).  The TSR defines seller, telemarketer, and customer.  The TSR does not, however, define "business," and no court has addressed what "business" means in the context of the TSR exemption.

As a general interpretive principle, the Court looks to the plain meaning of the regulation and ends its inquiry there if the language is clear.  Safe Air For Everyone v. Envtl. Prot. Agency, 488 F.3d 1088, 1097 (9th Cir. 2007).  "A regulation should be construed to give effect to the natural and plain meaning of its words."  Bayview Hunters Point Comm. Advocates v. Metro. Trans. Comm'n, 366 F.3d 692, 698 (9th Cir. 2004) (quotation omitted).  "The plain language of a regulation, however, will not control if clearly expressed administrative intent is to the contrary or if such plain meaning would lead to absurd results."  Safe Air, 488 F.3d at 1097 (quotation and alteration omitted).  Administrative intent is determined by looking to the published notices of the administrative agency.  Id. at 1097-98.  In sum, the plain meaning of a regulation governs "when such a meaning is apparent, not absurd, and not contradicted by the manifest intent of [the agency]."  Safe Air, 488 F.3d at 1100.

PBS is not exempted from the TSR's requirements when it solicits consumers at their place of employment simply because PBS is calling a business number.  Under a natural and plain reading of the exemption, a telemarketer is exempt when it solicits a business regarding purchases on behalf of the business.  Interpreting the regulation as PBS

suggests would produce an absurd result in that consumers would be protected at home but not at work.  Moreover, it is not unduly burdensome or unfair to require telemarketers to ask, at the outset of the call, for the person responsible for purchases on behalf of the business. Such a protocol would have been particularly easy here as the "lead" cards PBS receives from Dun & Bradstreet include the name of the business's manager or owner.

The Court need look at the published notices of the administrative agency only to determine if the Court's interpretation is clearly contrary to the intent of the administration.  The Court's interpretation is consistent with the administrative agency's intent, as well as congressional intent to protect consumers from abusive telemarketing practices.  See Notice of Proposed Rulemaking, 67 Fed. Reg. 4492 (January 30, 2002); 15 U.S.C. §§ 6101-02.  Soliciting an individual consumer while they are at work is at least as abusive, if not more so, than when they are at home. The FTC provides numerous examples of consumers who complained that PBS attempted to sell them magazines and collect money while the consumer was busy at work.  One consumer states that the numerous phone calls from PBS at her work caused problems with her employer.  The limited scope of the exemption is apparent, to exclude only telemarketing calls to businesses for business purchases.  Accordingly, for the reasons set forth above, the Court finds PBS is subject to the TSR's requirements.

## B. The Federal Trade Commission Act & Telemarketing Sales Rule

PBS contends it does not violate Section of 5 of the FTC Act or the TSR because it clearly discloses the purpose of the call, truthfully represents all material terms including the total cost of the magazines and how PBS collects payments, and strictly limits the number of times a consumer may be contacted.  PBS contends its qualification questions at the beginning of the call are proper because they are intended to ensure PBS is in compliance with the law.  As for comments such as "we have a small surprise for you," "with our best wishes," "monthly honor plan," and "customers are not being asked to buy a

cash subscription," PBS argues the statements are non-material and thus not regulated by the FTC Act.  PBS contends it never represents that the magazines are free or a gift, and a representation does not become false and deceptive merely because a statistically insignificant and unrepresentative segment of disgruntled consumers unreasonably misunderstood it.[11]  Moreover, a customer who fixates on the non-material representations and disregards statements about cost and payment, PBS contends, is not acting reasonably.

PBS also contends its company policy expressly forbids employees from deviating from the script, engaging in harassing or abusive conduct, or threatening customers.  PBS argues that even if the Court finds some of PBS's employees engaged in deceptive conduct, the FTC has not proven that PBS reaped the monetary benefits of the alleged misconduct because a large majority of complaining customers never paid PBS any money.[12]  Finally, PBS contends the verification recordings discredit many of the FTC's consumer declarations and show that PBS discloses all material terms to the customer.

The FTC contends that PBS's actions violate Section 5 of the FTC Act because PBS makes numerous misrepresentations in the initial call and subsequent communications.  Additionally, the FTC contends PBS is in violation of the TSR for (1) failing to disclose the seller's identity and purpose truthfully, (2) misrepresenting the total cost of the magazines, (3) making false and misleading statements to induce consumers to pay for magazine subscriptions, and (4) engaging in a pattern of threatening and abusive phone calls.  The FTC contends PBS misrepresents the purpose of its initial contact with customers by asking

---

[11]  PBS also contends the consumer declarations include inadmissible hearsay; however, the Court previously overruled this objection (Order on PBS's Mot. to Strike FTC's Summ. J. Mot. (Doc. #123).)  Thus, the Court will not address it again here.

[12]  Whether PBS received any monetary benefit from the misrepresentations is not necessary to establish a Section 5 violation.  F.T.C. v. Freecom Communications, Inc., 401 F.3d 1192, 1203 (10th Cir. 2005); Novartis Corp. v. F.T.C., 223 F.3d 783, 787 n.3 (D.C. Cir. 2000).

the potential customer if they would answer a few questions and telling consumers they have a "small surprise" for them and there is "no catch involved."  Although the dollar amounts provided in PBS's scripts may be literally true, the FTC argues that the net impression of the sales call is that customers will receive free magazines upon payment of nominal shipping and handling fees.  The FTC also contends that PBS targets consumers who are distracted and busy with their own customers.  The FTC contends in the verification recordings that the verifiers often fail to make the material disclosures by deviating from the script and failing to answer consumer questions clearly.  The FTC argues that the verification recording and the ten day internal control period are illusory safeguards that do not cure the misrepresentations PBS employees make in their lead call.

The FTC contends that in subsequent communications, PBS misrepresents to consumers that they have entered into binding contracts and that consumers' orders cannot be cancelled because PBS already has submitted orders to the publishers for five year subscriptions when PBS has not done so.  The FTC also argues that in the collections communications, PBS threatens its consumers with additional misrepresentations, including a collection letter implying that PBS has a "legal department."

Finally, the FTC contends the Court should disregard PBS's argument that most of PBS's customers are satisfied because the evidence shows that PBS's consumers who did not complain or cancel their orders were nonetheless dissatisfied with PBS's sales techniques.  The FTC argues that PBS's actual business practices do not conform to the business policies described in its Motion, as PBS does not fire employees for failing to follow the company's policies.  Moreover, the FTC contends PBS is liable for its employees' misrepresentations even if the employees' actions are contrary to PBS's official policy.

///

To establish a Section 5 violation, the FTC must show the representation,

omission, or practice is (1) "likely to mislead consumers acting reasonably under the circumstances (2) in a way that is material." F.T.C. v. Cyberspace.Com LLC, 453 F.3d 1196, 1199 (9th Cir. 2006). The representation may be either implied or express. F.T.C. v. Figgie Int'l Inc., 994 F.2d 595, 604 (9th Cir. 1993). Additionally, any violation of the TSR constitutes an unfair and deceptive act or practice in violation of Section 5 of the FTC Act. 15 U.S.C.§ 57a(d)(3), § 6102(c)(b). "[U]nder the FTC Act, a principal is liable for the misrepresentations of his agent acting within the scope of the agent's actual or apparent authority." F.T.C. v. Stefanchik, 559 F.3d 924, 930 (9th Cir. 2009).

To determine whether a representation, omission, or practice is likely to mislead, the Court considers the overall net impression the representation creates. Cyberspace.Com, 453 F.3d at 1200. Thus, a representation may amount to a Section 5 violation where the representation is literally true, if the overall net impression is likely to mislead. Id. As to the reasonable person determination, courts generally have limited the inquiry to the relevant audience. See Floersheim v. F.T.C., 411 F.2d 874, 877 (9th Cir. 1969) (noting the Commissioner did not find the collection form's disclaimer sufficient where the target consumer was often of low income with minimal formal education); Removatron Int'l Corp. v. F.T.C., 884 F.2d 1489, 1497 (1st Cir. 1989) (finding the target consumer is not limited to the beauty industry because Removatron advertised in local print media as well).

Although empirical consumer survey evidence is desirable, it is not, as a matter of law, required to support a Section 5 violation, where the deception is "self-evident." F.T.C. v. Brown & Williamson Tobacco Corp., 778 F.2d 35, 40 (D.C. Cir. 1985). "[W]hen the alleged deception rises to 'a commonplace,' a court may itself find the deception 'self-evident.'" Id. at 41 (quoting Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio, 471 U.S. 626, 652-53 (1985); see also Floersheim, 411 F.2d at 877 (holding proof of actual deception or capacity to deceive is not essential)). However, "[a] representation does not became 'false and deceptive' merely because it will be unreasonably misunderstood by

25

an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed." Cliffdale Assocs., Inc., 103 F.T.C. 110, 175 (1984).

In Kraft, Inc. v. Federal Trade Commission, the United States Court of Appeals for the Seventh Circuit found that although Kraft's representation that it used five ounces of milk in making each Kraft single was literally true, the implied representation that each Kraft single was equivalent to five ounces of milk was false, as the average consumer would not know that roughly thirty percent of the calcium was lost during processing.  970 F.2d 311, 322 (7th Cir. 1992).  In Removatron International Corp. v. Federal Trade Commission, the First Circuit found that, although Removatron never represented that its machine could permanently remove hair one hundred percent of the time, by representing that it could effectively remove hair permanently, and comparing it favorably to electrolysis, Removatron created the net impression that the machine would "permanently remove hair for most people most of the time."  884 F.2d 1489, 1497 (1st Cir. 1989).  The Court thus held that there was substantial evidence to support the Commission's finding that Removatron's representations were misleading, as the effectiveness of the hair removal machine was not reasonably supported by scientific evidence.  Id. at 1498.

A representation, omission, or practice "is material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." Cyberspace.Com, 453 F.3d at 1201 (internal quotation omitted).  In Cyberspace.Com, the defendants mailed solicitations offering internet access by sending a check, usually for $3.50, attached to a form resembling an invoice. Id. at 1198.  The Court found the representations material because "the misleading impression the solicitation created-that the check was merely a refund or rebate-clearly made it more likely that consumers would deposit the check and thereby obligate themselves to pay a monthly charge for the internet service." Id. at 1201.

The TSR requires the telemarketer to "disclose truthfully, promptly, and in a

1    clear and conspicuous manner . . .[t]hat the purpose of the call is to sell goods or services."

2    16 C.F.R. § 310.4(d).  The TSR prohibits a telemarketer to misrepresent, directly or by

3    implication, the total cost of the goods, or to make a "false or misleading statement to

4    induce any person to pay for goods or services . . ."  16 C.F.R. § 310.3(a)(2) &

5    § 310.3(a)(4).  The TSR further prohibits a telemarketer from engaging in a pattern of

6    abusive calls including "[c]ausing any telephone to ring, or engaging any person in

7    telephone conversation, repeatedly or continuously with intent to annoy, abuse, or harass

8    any person at the called number."  16 C.F.R. § 310.4(b)(1)(i).

9                           1.  Initial & Verification Calls

10           Viewing the facts in the light most favorable to PBS on the FTC's Motion, no

11   material question of fact remains that PBS's initial and verification calls are in violation of

12   the FTC Act and the TSR.  In the initial call, PBS begins by asking the consumer if they

13   will answer a few questions and in return PBS has a "small surprise, nothing big but it's

14   nice."  The "surprise" is PBS is selling magazine subscriptions; however, PBS does not

15   promptly disclose its purpose in a clear and conspicuous manner.  Instead, the PBS

16   representative tells the consumer "there is no catch involved" and there is a "sound business

17   reason" because the magazines' advertisers want to be assured their ads will be read.  The

18   PBS script indicates the consumers' information is being collected for PBS's advertisers,

19   however, PBS admittedly does not provide any information to the magazine advertisers.

20   Next, the PBS representative informs the consumer she is not asking the consumer to "buy

21   any cash subscriptions," she is only asking the consumer to "thank us in return by helping

22   to defray the cost of getting them out to you," thus suggesting the consumer is paying only

23   for shipping and handling, not the cost of the subscription.  Although the "cost" is

24   approximately seven hundred dollars, PBS initially represents the cost as only two dollars

25   and seventy-six cents a week.  Further, while the initial represented price of two dollars and

26   seventy-six cents is accurate, it is misleading because PBS does not collect the payment

weekly or even monthly.  Rather, the PBS representative making the initial call tells the consumer that "most people send it in two months at a time."  When the consumer is transferred to the supervisor to confirm some information, the supervisor informs the consumer that the initial suggestion to pay doubled-up monthly payments is made a term of the agreement.

Likewise, the verification call begins by thanking the consumer for doing the survey and asking the consumer if he or she would consent to having their information verified on tape.  The verifier subsequently adds an additional term to the agreement, informing the consumer that the order cannot be cancelled.  Albeit true that by the end of the verification call PBS has informed the consumer of all the terms of the agreement, the way in which PBS selectively discloses the material terms throughout the various calls, prefaces subsequent calls by informing the consumer PBS is just confirming information, and then adding new required terms is likely to mislead.

PBS contends the FTC's evidence is insufficient to establish PBS's representations are misleading because, based on PBS's First Payment coupons, the number of charge backs, and the percentage of consumer complaints PBS and other agencies received, the majority of PBS consumers are satisfied.  PBS contends that the FTC does not provide any legitimate survey evidence to rebut this fact.  However, where the Court finds the deception "self-evident," the FTC need not establish that a majority of PBS consumers were misled, nor does it need to provide empirical survey evidence that the representation has a capacity to deceive a majority of consumers.  Furthermore, the FTC presents supporting evidence from consumers and former PBS employees.  Thus, the Court need not rely only on its own interpretation of PBS's representations.

The FTC presents declarations from numerous consumers who believed the initial conversation represented the entire agreement–that the offer was either free or for a nominal amount, and that there was no long-term obligation or no obligation at all.

Consumers also reported being confused by the terms of the offer because the PBS employee was speaking rapidly.  A number of consumers state they did not believe they were agreeing to accept magazines or to make any payments, but instead were agreeing to receive written materials on the offer.

The FTC also presents declarations from former PBS employees who state they were instructed to speak rapidly, evade consumer questions, and encouraged to deviate from the script.  PBS argues these practices are against company policy and that PBS strictly enforces and monitors what PBS employees represent to consumers.  However, the undisputed "bad tapes reports" of four verifiers, who were listed as current PBS employees as of 2008, demonstrates PBS employees engaged in repeated misconduct over an extended period of time, and PBS either did not strictly enforce its policies or even encourage such conduct.  Moreover, PBS does not provide a single declaration of one of its employees to rebut the assertions made by former PBS employees.  Instead PBS relies on the individual Defendants' assertions that such conduct is against PBS's company policy.

PBS's representations are material because the net impression has a tendency to mislead the consumer into agreeing to a long-term obligation to pay PBS hundreds of dollars.  With respect to the reasonable person determination, the relevant audience is the person who is responsible for answering the phone at a business, as PBS admits it does not instruct its employees to ask for the person responsible for purchases on behalf of the business.  PBS disputes that it targets certain types of employees.  However, former employees state they were more successful selling to stores with employees who were busy with their own customers and too distracted to listen carefully, and numerous consumers state they were busy at work and distracted when the PBS representative called.

PBS contends that a consumer who agrees to the terms without listening carefully is not acting reasonably under the circumstances.  PBS's contention presumes, however, that the consumer is aware they are agreeing to terms to which they will later be held.  Even

if, as PBS suggests, the consumer listened carefully, and notwithstanding PBS's selective disclosure of material terms, there is undisputed evidence that PBS employees speak quickly, deviate from the script, and evade consumer questions.  Besides bare assertions, PBS presents no evidence that employees are reprimanded for such conduct.

Viewing the facts in the light most favorable to PBS, the Court finds no question of material fact remains that in the initial and verification calls, while some of PBS's representations may be literally true, the net impression of the representations is likely to mislead a consumer acting reasonably under the circumstances in a way that is material.  Accordingly, the Court finds PBS is in violation of Section 5 of the FTC Act and the TSR with respect to its initial and verification calls.  The Court therefore will grant the FTC's Summary Judgment Motion on counts one, three, and four with respect to the initial communications, and deny PBS's Motion for Summary Judgment on counts one, three, and four with respect to the initial communications.

## 2.  Subsequent Communications

Viewing the facts most favorable to PBS on the FTC's Motion, no question of material fact remains that PBS's subsequent communications violate Section 5 of the FTC Act and the TSR.

PBS makes at least two undisputed misleading representations to induce payment.  When consumers call to cancel, a PBS customer service agent represents to the consumer that they cannot cancel because PBS already has put in the full order with the publisher.  Dirk Dantuma admits PBS representatives do not inform consumers that in some cases the entire five year subscription has not been pre-paid.  PBS contends the representation that the full order has been processed when in fact representatives at some point will have to renew the subscription with the publishers is immaterial and irrelevant because PBS has no duty to inform consumers of the terms of its agreement with the magazine publishers.  PBS's argument, however, does not diminish the misleading nature of

PBS's statement that the consumer cannot cancel because the order already has been placed, thereby inducing the consumer to pay for the full five year subscription.

Additionally, PBS sends a collection letter representing the sender as part of PBS's legal department when PBS admits it has no such department and never initiates legal proceedings against consumers with delinquent accounts.  Although the letter does not explicitly state PBS will commence legal proceedings against the consumer for failure to pay, the net impression of the letter is that PBS has a legal department and legal action is a possibility.  Both representations are false and induce the consumer to pay PBS for the magazine subscriptions to avoid legal or other action.

With respect to the FTC's claim that PBS engages in a pattern of abusive calling with intent to annoy, abuse, or harass, the FTC presents evidence from consumers that PBS called the consumers repeatedly even after they asked PBS to stop.  A number of consumers also state that PBS agents threatened them.  Although the FTC does not present evidence from PBS collections agents admitting they engaged in this type of misconduct, the FTC presents evidence from former PBS employees that in the initial and verification calls, the employees were instructed to, or at least not reprimanded for, calling the consumer repeatedly even when the consumer said they were not interested.

Admittedly, the FTC does not present the same kind of compelling evidence of PBS's failure to enforce the stated company policy prohibiting harassing phone calls as the FTC presented with respect to PBS employees making repeated misleading representations in the verification call.  Nevertheless, that PBS fails to enforce company policy with respect to its verification employees at least suggests it approaches its collections employees with the same disregard.  PBS also engages in other misrepresentations in their collections efforts, as discussed above.  Furthermore, besides the bare assertion that repeated and threatening phone calls are against company policy, PBS presents no evidence from PBS employees that they did not engage in this type of misconduct.  Nor does PBS present any

evidence of specific employees that were fired for engaging in such misconduct.  PBS's assertions that its official policy prohibits harassment does not raise a genuine issue of material fact that PBS's de facto policy was to engage in harassing collections efforts.

Accordingly, viewing the facts in the light most favorable to PBS, no question of material fact remains that PBS's subsequent communications are in violation of Section 5 of the FTC Act and the TSR.  The Court therefore will grant the FTC's Summary Judgment Motion on counts five and six with respect to the initial communications, and deny PBS's Motion for Summary Judgment on counts five and six with respect to the initial communications.

**C. Damages**

The FTC seeks a permanent injunction prohibiting PBS and the individual Defendants from engaging in telemarketing and the sale of magazines.  The FTC contends a permanent injunction is proper in this case because Defendants have demonstrated an unwillingness to change their magazines sales practices to comply with the law.  The FTC also seeks monetary restitution for consumers injured by Defendants.  The FTC measures the restitution as the full amount of the purchase price or payment less any refunds, which equals approximately forty million dollars.

PBS argues, notwithstanding its contention that it is not in violation of the FTC Act or subject to the TSR, that any evaluation of damages is improper on summary judgment.  PBS contends an assessment of damages must be determined at an evidentiary hearing because there is a lack of correlation between the FTC's demand of PBS's gross revenue less refunds and the less than one percent of total consumer complaints lodged against PBS.  Additionally, PBS argues the FTC's assessment of damages includes conduct beyond the applicable three year statute of limitations pursuant to Section 19(d) of the FTC Act.

Section 13(b) of the FTC Act provides "that in proper cases the Commission may

seek, and after proper proof, the court may issue, a permanent injunction."  15 U.S.C.

§ 53(b).  To obtain consumer redress against an individual subject to injunctive relief under

Section 13, the FTC must establish "proof of injury caused by those practices" and "the

relief must be necessary to redress the injury."  <u>Figgie Int'l</u>, 994 F.2d at 605 (citing 15

U.S.C. § 57(b)).  Additionally, "[n]o action may be brought by the Commission under this

section more than 3 years after the rule violation . . . or the unfair or deceptive act or

practice to which an action" relates.  15 U.S.C. § 57b(d).

The Court will enter a permanent injunction coterminously with this Order.  The

FTC also requests significant monetary relief.   The parties, however, focus their briefs on

summary judgment on the merits rather than on relief.  The Court concludes an evidentiary

hearing is warranted to fully evaluate the appropriate monetary relief, if any, to award.

**IV.  CONCLUSION**

IT IS HEREBY ORDERED that the Federal Trade Commission's Motion for

Summary Judgment (Doc. #86) is hereby GRANTED on all counts and a permanent

injunction will be entered coterminously with this Order.

IT IS FURTHER ORDERED that Publisher Business Services' Motion for

Summary Judgment (Doc. #99) is hereby DENIED on all counts.

IT IS FURTHER ORDERED that counsel for the parties shall appear on May 18,

2010 at 9:30 a.m. in Courtroom 7C, in the United States District Court, District of Nevada,

located at 333 S. Las Vegas Blvd., Las Vegas, Nevada, 89101, for an evidentiary hearing on

the issue of damages to be awarded, if any.

///

///

///

///

IT IS FURTHER ORDERED the FTC shall file an opening brief on the issue of damages by April 20, 2010.  PBS shall file a response brief by April 30, 2010.  The FTC shall file a reply brief by May 7, 2010.  No brief shall exceed ten (10) pages in length.

DATED:  April 7, 2010.

_____
PHILIP M. PRO
United States District Judge