1    Jeffrey Willis, Esq. (Nevada Bar No. 4797)
     Brian R. Reeve, Esq. (Nevada Bar No. 10197)
2    SNELL & WILMER L.L.P.
     3883 Howard Hughes Parkway, Suite 1100
3    Las Vegas, Nevada  89169
     Telephone: (702) 784-5200
4    Facsimile:  (702) 784-5252
     Email:  jwillis@swlaw.com
5            breeve@swlaw.com

6    *Attorneys for Publishers Business Services, Inc.*
     *and Ed Dantuma Enterprises, Inc.*
7
     Peter Homer (*admitted pro hac vice*)
8    H. James Montalvo (*admitted pro hac vice*)
     Homer Bonner, P.A.
9    1441 Brickell Avenue
     1200 Four Seasons Tower
10   Miami, FL 33131
     Telephone: (305) 350-5100
11   Facsimile:  (305) 982-0066
     Email:  phomer@homerbonner.com
12           jmontalvo@homerbonner.com

13   *Attorneys for Brenda Schang, Dirk Dantuma,*
     *Dries Dantuma and Jeff Dantuma*
14
     David R. Koch (Nevada Bar No. 8830)
15   Koch & Scow, LLC
     11500 S. Eastern Avenue, Suite 210
16   Henderson, NV 89052
     Telephone: (702) 318-5040
17   Facsimile:  (702) 318-5039
     Email:  dkoch@kochscow.com
18
     *Attorney for Edward Dantuma and Persis Dantuma*

19

20

21                 **UNITED STATES DISTRICT COURT**

22                     **DISTRICT OF NEVADA**

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | CASE NO. 2:08-cv-00620-PMP-PAL |
| Plaintiff, | **DEFENDANTS' TRIAL BRIEF ON THE ISSUE OF EQUITABLE MONETARY RELIEF** |
| vs. | |
| PUBLISHERS BUSINESS SERVICES, INC., a corporation; ED DANTUMA ENTERPRISES, INC., a corporation, also dba PUBLISHERS DIRECT SERVICES and PUBLISHERS BUSINESS SERVICES; PERSIS DANTUMA; EDWARD DANTUMA; BRENDA DANTUMA SCHANG; DRIES DANTUMA; DIRK DANTUMA; and JEFFREY DANTUMA individually and as officers or managers of Publishers Business Services, Inc., or Ed Dantuma Enterprises, Inc., | |
| Defendants. | |

Defendants PUBLISHERS BUSINESS SERVICES, INC., ED DANTUMA ENTERPRISES, INC., PERSIS DANTUMA, EDWARD DANTUMA, BRENDA DANTUMA SCHANG, DIRK DANTUMA, JEFF DANTUMA, and DRIES DANTUMA (collectively "Defendants" or "PBS"), by and through their undersigned counsel, hereby submit their Trial Brief on the Issue of Equitable Monetary Relief.

## I.     PRELIMINARY STATEMENT

On March 30, 2011, the FTC will ask the Court to impose a $39 million financial death penalty on the corporate and individual Defendants in this case.  The FTC's request is premised on the unsupportable presumption that PBS did not have a single legitimate sale or a single satisfied customer and that every dollar PBS received during a five-year period was the result of deception.  The FTC does not have proof to support these presumptions.  In fact, the FTC **knows** that the presumptions are invalid because the FTC has communicated directly with satisfied PBS customers, deposed Defendants' economics expert, and reviewed Defendants' business records.  Yet, the FTC incredulously continues to assert that complete disgorgement of all revenues is appropriate to accomplish "complete justice."  The FTC is wrong.

The FTC's complete disgorgement theory is untenable; disgorgement applies only to *ill-*

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

*gotten gains*, *i.e.* sums received *because of* a Section 5 violation.  Without a causal link between Section 5 violations and customers' payments, monetary relief is inappropriate.  The Court has previously found that the "net impression" of PBS's Section 5 violations during the initial and verification calls was that the magazines it was selling were free or cost only a nominal amount and that there was no long-term obligation or no obligation at all.   The evidence at trial will show that there is no causal link between this net impression and customers' decision to make regular monthly payments over an extended period.

Courts have used their discretion to formulate various methods of determining appropriate equitable monetary relief consistent with the facts and circumstances of each case.  Some courts have ordered defendants to disgorge their net profits.  Other courts have taken into consideration the cost of goods sold in calculating monetary relief.  Some courts have ordered defendants to disgorge gross revenues minus refunds and still others have devised their own specific calculations.  As each case is different, courts sitting in equity have broad discretion to fashion appropriate remedies to accomplish complete justice.  Thus, simply because precedent exists for utilizing a certain method to calculate monetary relief under a different factual scenario does not mean that the same relief is appropriate under the unique facts and circumstances of this case.

While Defendants dispute that the FTC has met its burden to reasonably approximate the amount of Defendants' unjust gains under the facts of this case, Defendants will submit substantial evidence at trial demonstrating customer satisfaction.  Defendants will show that any Section 5 violations found by the Court did not impact the customers' decision to purchase and pay for magazines.  The evidence will show that customers did not come away with the "net impression" that the magazines were free.   In fact, customers wanted the magazines, they received the magazines, they paid for the magazines, and they read the magazines or used them for their business.

Defendants will also introduce evidence from former PBS employees and Defendants' expert Dr. Gregory Duncan, who has reviewed PBS's finances, business records and practices, and performed various analyses demonstrating that the FTC's monetary request is erroneous.  Dr. Duncan will provide the Court with several, more equitable monetary relief options based on facts

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   and logical calculations, not misplaced presumptions.  Each of these options comport with the

2   evidence in this case and the spirit of equity.

3         In addition, the individual Defendants in this case will present evidence to demonstrate

4   that they personally did not receive unjust gains from any Section 5 violation.  To date, the FTC

5   has generically stated that all of the "Defendants" committed the violations at issue and has

6   implied that all of the Defendants apparently benefited equally from the violations.  The

7   individual Defendants will testify at trial to explain their individual roles at the company and the

8   benefits in the form of payments that they received while employed at the company.  The FTC

9   cannot make the blanket claim that every individual who worked at the company is liable for

10   damages equating to the company's entire revenues, without regard to their role or the scope of

11   their employment.  Several of the individuals, for example, received a modest salary from PBS,

12   and the millions of dollars that the FTC is requesting is more than any of them would earn in

13   multiple lifetimes.

14         In sum, trial must necessarily start with the question of whether any unjust gains were had

15   *because of* the Section 5 violations at issue, as it cannot be the case that every time a violation

16   occurs, all of a company's revenues over multiple years are automatically subject to disgorgement

17   irrespective of causation and with only anecdotal proof of consumer injury.  Defendants'

18   evidence will show that when the true facts are analyzed, there is little, if any, "monetary

19   damage" that could be said to exist in this case.

20   **II.      PROCEDURAL HISTORY**

21         In May 2008, the FTC filed this action alleging that some aspects of PBS's solicitation

22   process employed to sell magazine subscriptions were deceptive under Section 5 of the FTC Act

23   and the Telemarketing Sales Rule ("TSR").  The parties cross-moved for summary judgment and

24   on April 7, 2010, this Court issued its Order finding that PBS was in violation of Section 5 and

25   the TSR.  The Court found Section 5 violations from the use of phrases such as "small surprise,"

26   "no catch," "information is being collected for PBS's advertisers," and that although PBS refers

27   to weekly payments "PBS does not collect the payment weekly."  The Order found that "[a]

28   number of consumers state[d] they did not believe they were agreeing to accept magazines or to

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

make any payments." (See Order, Doc. #151 at 27-30.) The Court stated that the "net impression" of PBS's representations had a tendency to mislead a consumer. The Court recognized that by the end of the verification call "PBS has informed the consumer of all the terms of the agreement," but concluded that the way in which PBS disclosed the terms and prefaced subsequent calls by telling the consumer that PBS is confirming information was likely to mislead. (See Order at 28:9-13.)

The Court's Order did not determine that any monetary remedies were appropriate. It instead ordered the present hearing scheduled for March 30, 2011, to determine whether there should be monetary remedies and, if so, how much. Since the Order was issued, the parties have conducted discovery focusing on the issue of whether equitable monetary relief is appropriate, and if so, what the proper measure should be. Defendants previously submitted a brief regarding the issue of damages (Docket #161), but since additional discovery has been conducted and legal issues have arisen since the original damages briefing, Defendants submit this updated Trial Brief for purposes of the March 30, 2011 evidentiary hearing.

### III.    LEGAL STANDARD

Section 5 of the FTC Act states that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a). An act or practice is deceptive if each of the following elements is present: "*first*, there is a representation, omission, or practice that, *second*, is likely to mislead consumers acting reasonably under the circumstances, and, *third*, the representation, omission, or practice is material." FTC v. Pantron I Corp., 33 F.3d 1088, 1095 (9th Cir. 1994) (Emphasis added).

Once a Section 5 violation has been established, Section 13(b) of the FTC Act (15 U.S.C. § 53(b)) gives courts the authority to issue a permanent injunction to enjoin the Section 5 violation. Courts have also interpreted Section 13(b) in a way that gives them "broad authority to fashion appropriate remedies for violations of the Act." Id. at 1102. A court has discretion under Section 13(b) "to grant any ancillary relief necessary to accomplish complete justice." Id. Courts have used a variety of methods to accomplish complete justice under the facts and circumstances

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

of each case.

To obtain any monetary relief, the FTC must prove that consumer injury resulted from the Section 5 violation.  Id.  In order to demonstrate consumer injury, the FTC must show that consumers relied on the Section 5 violation in parting with their money.  See FTC v. Figgie, 994 F.2d 595, 605-06 (9th Cir. 1993).  Instead of requiring the FTC to prove individual reliance by each consumer, courts have allowed the FTC to use a ***presumption*** of reliance if the FTC can prove three elements: (1) that the defendants made material misrepresentations; (2) that they were widely disseminated; and (3) that consumers purchased the defendant's product.  Id.  If the FTC is able to satisfy these three elements, then the burden shifts to the defendants to rebut the presumption.  Id. at 606.

Pursuant to Federal Rule of Evidence 301, once evidence has been introduced to rebut a presumption, the presumption disappears.  See Fed. R. Evid. 301; Nunley v. Los Angeles, 52 F.3d 792, 796 (9th Cir. 1995) (finding Rule 301 embodies the "bursting bubble" approach to presumptions and adopting that standard).  As the Ninth Circuit noted in Nunley, "where a district judge requires extensive evidence to rebut the presumption or continues to rely upon the presumption after it is rebutted, the district judge effectively erects an irrebuttable and insurmountable barrier."  52 F.3d at 796.  While the FTC has not demonstrated that it is entitled to rely on the presumption, the evidence at trial will show that the presumption nevertheless has been rebutted.

If the Court finds that consumer injury exists, a burden-shifting framework for calculating monetary relief arises.  First, the FTC must "show that its calculations reasonably approximate the amount of defendant's unjust gains, after which the burden shifts to defendants to show that those figures were inaccurate."  FTC v. Verity Int'l, Ltd., 443 F.3d 48, 67 (2d Cir. 2006).  Before the burden shifts, the court must "first assess the reasonableness of the FTC's approximation of unjust gain."  Id.  Only monies received as a result of a Section 5 violation may be disgorged.  See e.g., Figgie, 994 F.2d at 605 ("there may be no redress without proof of injury caused by those practices."); SEC v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.D.C. 1989) ("the court may exercise its equitable power only over property causally related to the

wrongdoing…disgorgement may not be used punitively); and <u>FTC v. Prochnow</u>, Findings of Facts and Conclusions of Law, Docket # 170, 1:02-CV-0917 (N.D. Ga. Dec. 2, 2005) (FTC must "distinguish between legally and illegally obtained profits" under Section 13), <u>aff'd</u> 2007 U.S. App. LEXIS 24718 (11th Cir. Oct. 22, 2007).

## IV.     LEGAL AND FACTUAL ISSUES TO BE ADDRESSED AT THE HEARING

### A.     The FTC's "Approximation" of PBS's Unjust Gains is Inequitable and Irresponsible

The FTC has failed to meet its burden to reasonably approximate PBS's unjust gains. Simply offering Defendants' tax returns into evidence and arguing that all revenues should be disgorged is not only inadequate but also irresponsible under the facts of this case.  Financially obliterating a defendant requires concrete proof, not inferences and speculation.

In Defendants' Brief on the Issue of Damages (Doc. #161), Defendants articulated five reasons why the FTC had not met its burden to reasonably approximate the amount of Defendants' unjust gains.  Rather than repeat them here, Defendants hereby incorporate them by reference.  In addition to those five reasons, the FTC's request for complete disgorgement of every dollar PBS received during a five-year period is irresponsible because The FTC's own evidence does not support it.

The FTC knows that complete disgorgement of all revenue is not a reasonable approximation of PBS's unjust gains because the FTC has spoken directly with satisfied PBS customers.  Defendants will present evidence at trial showing that Bruce Gale, an FTC investigator, contacted PBS customers and asked them a series of leading questions about their experience with PBS.  The evidence will show that notwithstanding the biases that Mr. Gale might have introduced during his interviews approximately half of the customers he spoke to had no complaints about PBS.[1]  In addition, FTC employee Juliana Blatz Du Rivage interviewed PBS customers and learned that many of the customers were satisfied.[2]  Despite obtaining first hand

---

[1] According to Mr. Gale, some of the customers responded that they didn't remember PBS, while others affirmatively stated that they were satisfied.

[2] The Court struck Ms. Du Rivage's declaration as improper survey evidence.  The purpose of raising this evidence now is to show that the FTC knew before summary judgment that Defendants had satisfied customers and yet continued to insist that every customer was deceived.

1  knowledge of customer satisfaction, the FTC did not adjust its "approximation" or even alert the

2  Court that complete disgorgement was inappropriate in light of the evidence in its possession.

3       **B.      Defendants Will Prove that the FTC's Approximation is Erroneous**

4       While Defendants dispute that the FTC has met its burden to reasonably approximate the

5  amount of Defendants' unjust gain, Defendants will present evidence at trial demonstrating that

6  the FTC's approximation is inaccurate.

7       1.      The FTC's reliance on "products" cases to support its approximation of
                unjust gains is misplaced

8

9       The FTC relies on factually inapposite cases to support its request for complete

10  disgorgement of all revenues in this case.   In most Section 5 cases, vendors misrepresent the

11  product being sold.   See e.g., FTC v. Pantron, 33 F.3d at 1101 (defendants misrepresented

12  effectiveness of the "Helsinki Formula" in combating male pattern baldness); FTC v. Figgie, 994

13  F.2d at 603-04 (defendants misrepresented effectiveness of heat detectors in comparison to smoke

14  detectors); FTC v. Stefanchik, 559 F.3d 924, 926-29 (9th Cir. 2009) (defendants misled

15  customers into believing that if they purchased the "Stefanchik Program" they could quickly

16  make large amounts of money in their spare time); FTC v. Bay Area Bus. Council, Inc., 423 F.3d

17  627, 635 (7th Cir. 2005) (defendants represented to customers that they would receive credit

18  cards, but instead provided stored-value cards); FTC v. SlimAmerica, Inc., 77 F. Supp. 2d 1263

19  (S.D. Fla. 1999) (defendant's weight loss product was not medically endorsed as represented);

20  FTC v. QT, Inc., 512 F.3d 858, 860-63 (7th Cir. 2008) (defendants made false statements about

21  health benefits customers would receive from wearing the Q-Ray Ionized bracelet); FTC v.

22  Security Rare Coin & Bullion Corp, 931 F.2d 1312, 1313 (8th Cir. 1991) (defendants fraudulently

23  marketed rare coins to consumers for investment purposes).

24       Where a defendant universally misrepresents the nature of the good being sold (e.g.,

25  misrepresents that rhinestones are diamonds), demonstrating consumer injury is straightforward.

26  In these "false-products" cases, customers parted with their money because of the

27  misrepresentations, e.g. because they believed the Q-Ray bracelet would relieve pain, the

28  Helsinki Formula would stop male pattern baldness, or rare coins would be a sound and profitable

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

investment.  These cases, however, are inapplicable to this case because PBS did not misrepresent the product being sold.  PBS's products were known commodities; magazines that could be purchased at a grocery store, book store or online.  Customers had the option of choosing the magazines that they wanted from a wide selection, and during their subscription term they could change magazines.

The fact that PBS is truthful about its product is critical. Where a defendant is truthful about its product but employs a sales method that violates Section 5, courts must exercise restraint in imposing a monetary remedy.  For example, in <u>FTC v. Minuteman Press</u>, 53 F. Supp. 2d 248, 261 (E.D.N.Y. 1998), the court found that defendants were liable for misrepresenting the profitability of their franchises, but emphasized the need for caution in assessing the amount:

> the question of monetary relief, is considerably more problematical [sic] than the other issues discussed thus far.  Often, defendants facing such assessments are selling a fraudulent product…or blatantly misrepresenting the value of the product being sold….Here, in contrast, defendants are marketing a basically sound product, albeit in a manner which is violative of the FTC Act…Indeed, many franchisees have enjoyed significant success…The goal…should be to fashion appropriate redress, but mindful of the desirability of avoiding the economic obliteration of either [defendant].

Here, the Court's Order took issue with the sales process, not the product.  While some customers claim that the phone calls were misleading, the evidence will show that most of the complaining customers *never paid any money*.  Thus, unlike the misrepresentations in <u>Pantron</u> or <u>Stefanchik</u>, which induced customers to pay for the product, here the misrepresentations would have caused the customers *to withhold payment* because of a belief that the magazines were free or only cost a nominal amount.  The fact that customers made monthly payments contradicts the notion that customers parted with their money based on an impression that the magazines were free.  The causal link that made monetary relief appropriate in the false-products cases is missing in this case.

### 2. PBS's post-verification business practices show that complete disgorgement of all revenue is improper

Complete disgorgement of all revenues based on PBS's misleading sales statements during the initial and verification calls is also improper in light of PBS's business practices *after*

Snell & Wilmer

L.L.P.

LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

1  the verification call is over.  In a typical Section 5 case, there is a direct causal connection

2  between the misrepresentation and the seller's immediate receipt of the misrepresentation-

3  induced payment.  Here, after the verification call, each customer receives a packet of written

4  materials in the mail, including PBS's written guarantee, which plainly sets forth all the material

5  terms.[3]  Unlike other telemarketing companies which require payment immediately by credit or

6  debit card over the phone, a PBS customer's first payment is not due until approximately three

7  weeks after the customer receives the written guarantee in the mail.

8       These facts are significant because they show a temporal disconnect between oral delivery

9  of the representations cited in the Order and a customer's decision to make a payment.  Since

10  PBS sends *every customer* the written guarantee in the mail long before the first payment is due,

11  even if the oral delivery of the offer were garbled or misunderstood, there is nothing ambiguous

12  about the guarantee and the Court found nothing misleading about the guarantee.  Customers paid

13  PBS because the terms in the written guarantee were either consistent with their prior

14  understanding of the deal, or if the terms were inconsistent, they were still acceptable to the

15  customer.  The evidence will show that a large majority of the customers who thought the terms

16  of the deal were different than those set forth in the written guarantee did not pay for the

17  magazines.

18       To the extent the FTC argues that it is unknown whether customers read the written

19  materials PBS sent them, the evidence and logic shows that customers did in fact read the

20  materials.  Before receiving the written materials, customers did not have an address to send their

21  payments (or complaints), did not have the form with which to change their magazines or

22  shipment information, and did not have a credit card authorization form or PBS's Internet

23  address.

24       The FTC's case is largely premised on the assumption that a customer's decision to pay

25  resulted from PBS's statements during the initial and verification calls, and not from the

26  subsequent written guarantee.  Yet, customers are not required to pay until after they have had

27
28  [3] The Court did not find that the written guarantee violated Section 5.  Rather, the Court found that the guarantee contained "information on the price of the subscription, the length of the subscription, the terms of the agreement, and the non-cancellation policy."  (Order at 10:4-6.)

weeks to review the guarantee and cancel the subscription.  No reasonable customer can claim that he proceeded to pay PBS because he was misled to believe that the magazines were free or for a nominal amount.  Further, to the extent a customer had the net impression that the magazines were free or only cost a nominal amount during the initial and verification calls, that impression evaporated once the customer received the written guarantee.  In other words, this case lacks the proverbial "action in reliance upon."

In addition to receiving the written guarantee, the evidence will show that customers also received a post-verification telephone call from a PBS representative offering a 10% discount off the total price in exchange for a commitment to pay off the account within six months.  This again demonstrates that customers were made aware of the total price of the magazines and their agreement to pay for the magazines from the beginning.  The FTC cannot claim that customers who made payments after receiving this early payoff offer were still under the impression that the magazines were free or cost some nominal amount.

Perhaps the most important post-verification evidence demonstrating that the FTC's approximation is erroneous is the fact that a large portion of PBS's revenue came from renewals and add-ons.  The evidence will show that a majority of Defendants' revenue came from customers who purchased additional magazines from Defendants after they had already been receiving magazines for some period and had been making payments for those magazines.

### 3.     Evidence of satisfied customers contradicts the FTC's approximation

In determining whether to award equitable monetary relief, the Court must consider evidence of satisfied customers.  See FTC vs. Amy Travel Serv., Inc., 875 F.2d 564, 572 (7th Cir. 1989) (court correctly acknowledged the existence of satisfied customers in computing amount of monetary relief); FTC v. Kuykendall, 371 F.3d 745, 764 766 (10th Cir. 2004) (defendants must have the opportunity to introduce evidence of refunds and satisfied customers in determining amount of monetary relief.)

Defendants will present evidence of customers' satisfaction with PBS's product and sales process.  The evidence will show that these customers knew they were buying magazines from PBS, they wanted the magazines, they knew what they were paying, and they believed the price

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

they were paying was fair.  Defendants will also present evidence that FTC employees Bruce Gale and Juliana Blatz Du Rivage conducted telephonic interviews with PBS customers and received confirmation of customer satisfaction direct from PBS customers themselves.

In addition, Defendants will present evidence of customer satisfaction through expert analysis of its detailed company records and through testimony of PBS employees.  This evidence will include the following facts, each of which demonstrates the considerable percentage of satisfied PBS customers:

- The small number of third-party complaints compared to the number of telemarketing calls made and customer accounts serviced;

- The tens of thousands of customers who purchased additional magazines from PBS by renewing or adding more magazines to their subscriptions;

- The positive feedback and customer comments on the First Payment Coupons that PBS received from customers;

- The extremely small percentage of credit card charge backs compared to the number of credit card sales/transactions during the relevant time period. Of the 278,318 credit card sales/transactions (totaling approximately $15,801,669.68) only 1,432 sales[4]—or 0.515%—were "charged back" because the customer disputed the sale.  This percentage was well below VISA's 1% threshold for monitoring merchants;

- Since the injunction was entered, customers have contacted PBS asking why it did not process their scheduled payments;

- Positive customer comments and other comments indicating customer comprehension on verification recordings;

- The substantial number of customers who changed magazines or notified PBS of an address change;

- The small amount of revenue received from customers who submitted third party complaints;

---

[4] The chargebacks total about $61,651.88, or 0.390%, of PBS's total credit card collections.

Snell & Wilmer

—— L.L.P. ——

LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

- The small amount of revenue received from customers who attempted to cancel (either by phone or in writing);

- Dr. Duncan's analysis of PBS's verification recordings and the completeness of the terms provided;

- The fact that PBS employees purchased and paid for hundreds of orders of magazines from PBS.

These facts show the unreasonableness of the FTC's "complete disgorgement" argument and further discredit the FTC's position that *every dollar* PBS received over a multi-year period was caused by a Section 5 violation. To the contrary, these facts demonstrate that only minimal, if any, equitable monetary relief is appropriate in this case.

> 4.   Complete disgorgement is inappropriate because each customer transaction was unique

The experiences of customers who did not pay for magazines prove nothing about the experiences of those customers who did. Not surprisingly, the non-paying, complaining customers often stated that they were busy at work, not paying attention, provided affirmative responses just to get PBS off the phone, and/or were confused because PBS was talking too fast. During the time period in question, PBS employed thousands of employees who talked to millions of individuals of every position and at every type of business all over the country. The evidence will show that some PBS employees spoke faster than others, answered questions better than others, were friendlier than others or followed company policy more closely than others. The evidence will also show that some consumers asked questions and were active and attentive during the verification call, while others were passive and seemingly distracted. The number of variables that would make one consumer's experience different than another's renders it impossible to reach a sweeping generalization about the experiences and impressions of all PBS customers and what caused them to pay for magazines.

This conclusion is buttressed by the fact that the customer complaints upon which the FTC relies contain widely varying accounts of what happened and, as the Court noted, are inconsistent with the complaining customers' verification recordings. Under the FTC's theory of

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

the case, since each customer heard the same brief sales presentation, each customer should have had the same net impression and suffered the same injury. The evidence will conclusively establish, however, that each customer did not have the same net impression of the sales calls and was not injured.

This is not a "one size fits all" case akin to the "false-products" cases the FTC is accustomed to filing. The Court found that by the end of the verification call all of the terms of the deal had been disclosed and certainly by the time customers received the written guarantee they were aware of the terms. Reasonable customers who listened to the verification call and/or read the written materials did not part with their money because of the Section 5 violations found by the Court during the initial calls.

5.   <u>PBS's collections practices do not justify complete disgorgement</u>

In the Order, the Court identified two specific Section 5 violations that it believed were likely to induce customers to pay. First, the Court found that when customers call to cancel, PBS employees represented that they could not cancel because PBS had already paid for the full five-year order. (Order at 30-31.) Second, the Court concluded that one of PBS's collection letters was misleading because it purported to be from "PBS's legal department" and PBS did not have a legal department. The Court ruled that although the letter does not expressly threaten legal action, the net impression is that PBS has a legal department and that legal action is a possibility if the customer does not pay. (Order at 31.)

The first of these Section 5 violations does not support complete disgorgement of all revenue for at least two reasons. First, Defendants will present evidence that their collections policies prohibited collectors from telling customers that they could not cancel because the magazines had already been paid for. Defendants will also present evidence showing that PBS managers and supervisors constantly monitored collections employees to make sure they were following company policy. Second, to the extent such a representation was made, it would only have been made to a customer who called in to cancel and who spoke to an employee who violated company policy. Nevertheless, even assuming that every customer who called in to cancel heard this representation, the evidence will show that the revenue PBS received from

Snell & Wilmer

L.L.P.

LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

customers who requested to cancel for any reason is only a small fraction of the gross revenue the FTC is attempting to disgorge.

PBS's collection letter likewise does not support complete disgorgement because Defendants will present evidence showing that, on average, approximately 0.43% of PBS's revenue in a given month came from customers to whom PBS sent the collection letter identified by the Court.  Thus, even assuming that all of this revenue was induced by the "legal department" reference in the letter, the amount of revenue is miniscule compared to PBS's gross revenues and does not support complete disgorgement.

The Court's Order also mentions that customers complained of being harassed, that PBS collectors threatened to hurt their credit or threatened to initiate legal proceedings against them. The evidence will show that such conduct violated company policy and, to the extent it happened, was the rare exception, not the rule.  Any revenue that the FTC can demonstrate resulted from this type of conduct is small.

## C.    The Court Has Broad Discretion To Fashion Its Own Remedy

The FTC acknowledges that the Court has broad discretion and authority to fashion an appropriate equitable remedy but yet continues to urge the Court to throw that discretion out the window in favor of a mechanical application of "precedent."  Instead of engaging in a meaningful consideration of the facts and weighing of the equities, the FTC would have the court hastily order complete disgorgement of all revenues because "that's what some other courts have done." Such an approach is contrary to the Court's responsibility to "do equity and []mould each decree to the necessities of the particular case."  Hecht Co. v. Bowles, 321 U.S. 321, 329 (1994).

A review of FTC enforcement cases demonstrates that courts have used their discretion to devise their own equitable remedies and precedent exists for a variety equitable monetary awards.  For example, in FTC v. Magui Publishers, Inc., 1991-1 Trade Cases p. 69,425, 1991 WL 90895 (C.D. Cal. 1991), aff'd, 9 F.3d 1551 (9th Cir.1993), the defendants produced etchings and lithographs which they fraudulent marketed to consumers as works created and signed by the Spanish artist Salvador Dali.  The court found defendants liable for violating Section 5 of the FTC Act but held that the defendants were entitled to deduct the cost of producing the art

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1  (roughly $2 million dollars) from their gross revenues in calculating the amount of defendants'

2  "unjust enrichment."

3          In FTC v. Amy Travel Service, Inc., 87 F.2d 564, 572 (7th Cir. 1989), the court approved

4  the deduction of revenues received from satisfied customers from the amount of redress.   The

5  court noted that "[t]he difficulties involved in determining how much relief should be given to

6  dissatisfied customers prompted the magistrate to limit the relief to those customers who received

7  nothing of value for the price of the vacation passport."  Id.  In FTC v. Verity Intern., Ltd., the

8  Second Circuit recognized that the appropriate amount of monetary relief was not the "full

9  amount lost by consumers;" but rather, "the benefit unjustly received by the defendants."  443

10  F.3d 48, 66 (2d Cir. 2006).

11          In FTC v. QT, Inc., 512 F.3d 858, 863 (7th Cir. 2008), the Seventh Circuit upheld the

12  district court's decision to disgorge the defendants' *profits*.  The defendants' net sales were over

13  $87 million during the time period in question, but the Court only required the defendants to

14  disgorge their net profits in the amount of $15.9 million.[5]   The court found that this remedy was

15  appropriate even though the defendants blatantly misrepresented the health benefits customers

16  would receive for wearing their bracelet.   See also Pantron I Corp., 33 F.3d at 1103 n.34

17  (explaining that where a district court "reasonably concludes that it would be impossible or

18  impracticable to locate and reimburse all of the consumers who have been injured…it may order

19  some other remedy which requires [the defendant] to disgorge its unjust enrichment."); FTC v.

20  Trudeau, 579 F.3d 754, 771-72 (7th Cir. 2009) (defendant's profits can be a proper measure of

21  monetary relief in FTC enforcement actions).

22          As yet another alternative to complete disgorgement, the court in FTC v. Gem

23  Merchandising Corp., 87 F.3d 466 (11th Cir. 1996) affirmed the district court's decision simply

24  to award $100 to each of defendants' 5,000 customers.

25          Two challenges complicate the assessment of monetary relief in this case.  The first is

26  that while PBS's evidence demonstrates that the majority of its revenue was lawfully gained, it is

27  impossible to pinpoint what subjectively motivated each of PBS's customers to make their

28  _____

[5] See the district court Order calculating the amount of disgorgement at FTC v. QT, Inc., 472 F. Supp.2d 990, 995-96 (N.D. Ill. 2007).

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

individual payments and, more importantly, whether their payments were induced by a Section 5 violation.  The second challenge is the logistical conundrum acknowledged in <u>Pantron</u>: there is simply no way to track down and compensate every PBS customer who paid PBS in reliance on PBS's Section 5 violations.

Calculating equitable monetary relief under 13(b) requires a reasonable approximation of PBS's unjust gain causally linked to a violation of Section 5.  PBS submits that the FTC has failed to meet its burden and therefore no equitable monetary relief is appropriate.  The Court already entered a permanent injunction against Defendants and that is sufficient to do "complete justice."  To the extent the Court is inclined to grant ancillary equitable monetary relief, based on the evidence that will be presented at trial, PBS proposes that the Court require no more than full reimbursement to all complaining customers in the amount of $61,589.  This method reasonably limits the world of customers who must be located and reimbursed to those whom we know for certain felt deceived.[6]  Alternatively, based on Dr. Duncan's analysis of revenue that PBS received from customers who may have been misled, the amount of equitable monetary relief should be no more than $191,218.68.

Forcing PBS to disgorge its gross revenues would require disgorgement of money PBS paid in taxes, money it paid to magazine publishers, and money it paid for employees' salaries, benefits, and other business operating costs—in other words, money that PBS rightfully paid to third parties in the usual course of business and that is no longer in its possession.  Such an award would mean refunding monies to thousands of happy customers who paid for and received the magazines they wanted.  Such an award would be inequitable on the facts of this case.  Thus, assuming that the evidence was devoid of any satisfied customers, as an alternative amount of equitable monetary relief, Defendants submit that PBS's profits before interest, taxes and depreciation (EBITDA) in the amount of $698,446 is more than sufficient to accomplish complete justice.  This amount ensures that Defendants are deprived of any profits related to their Section 5 violations without imposing a financial death penalty.

---

[6] The FTC argues that this method employs the "wrong legal test."  As evidenced by the plethora of divergent calculations and remedies used by the courts, there is no single "correct" test or formula.  Instead, courts are free to use their equitable powers to tailor appropriate relief.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702) 784-5200

**D.      The Individual Defendants Should Not Be Held Jointly and Severally Liable**

The FTC apparently intends to try to rely on a purported theory of "joint and several liability" for its claims against the individual Defendants in this case.  However, the FTC's expansive interpretation of "joint and several liability" pushes it beyond the Court's equitable authority.  Case law addressing the standard for individual liability bases it on direct participation or control over the alleged misleading activities.

Under the FTC Act, corporate liability is necessary -- but insufficient alone – to create individual liability.  The standard for individual liability is significantly higher than for corporate liability.  The FTC must show that the individual either "participated directly in the unlawful acts or practices or had authority to control them."  FTC v. Publishing Clearing House, Inc., 104 F.3d 1168, 1170-71 (9th Cir. 1997).  More than simply acting in a supervisory capacity is needed to establish individual liability.

The FTC must also show that the Individual Defendants had knowledge of deceptive acts or practices. In order to establish individual liability under the FTC Act, the FTC must prove that an individual had knowledge that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted.  The FTC may establish knowledge by showing that the individual defendant (1) had actual knowledge of material misrepresentations, (2) was recklessly indifferent to the truth or falsity of a misrepresentation, or (3) had an awareness of a high probability of fraud along with an intentional avoidance of the truth.  FTC v. Network Services Depot, Inc., 617 F.3d 1127, 1138-39 (9th Cir. 2010) (internal quotation marks, citations, brackets omitted, emphasis and numbering added); see also Publishing Clearing House, Inc., 104 F.3d 1168; Amy Travel Serv., Inc., 875 F.2d at 573-74 ("Once corporate liability is established, the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them…. The FTC must then demonstrate that the individual had some knowledge of the practices.").  As the Tenth Circuit has recognized, "[i]t is axiomatic that each defendant is entitled to an individualized determination of

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

his interests." <u>Kuykendall</u>, 371 F.3d at 758. Looking at the evidence against each Individual Defendant, the FTC's case for individual restitution liability falls apart.

Here, the evidence is clear that none of the Individual Defendants had any actual knowledge of fraud, or even an awareness of a high probability of fraud concerning PBS. The evidence demonstrates that PBS maintained sales, verification, and collections policies in place, and although certain employees violated policies, those violations were not condoned or engaged in by the Individual Defendants. Accordingly, the FTC cannot demonstrate this "heightened knowledge" requirement for any of the Individual Defendants.

Moreover, even if there was evidence of actual knowledge on the part of the Individual Defendants, any disgorgement/restitution damage calculations are strictly limited to "unjust gains" received by the Individual Defendants. The FTC is not entitled to restitution because none of the Individual Defendants were unjustly enriched.

As a threshold matter, depending on whether the Court calculates PBS's profits based on PBS's income statements or EBITDA from its tax returns, PBS either lost money or made less than $700,000 in profits during the relevant five year period. To the extent the FTC argues that the Individual Defendants were enriched by the revenues received by PBS, such enrichment should not be imposed on the Individual Defendants given the modest salaries they received from PBS ranging from $40,000 to $65,000, minus all taxes and costs. Simply put, the Individual Defendants received no ill-gotten gains.

## V.    CONCLUSION

The FTC has failed to meet its burden in this case to reasonably approximate the amount of Defendants' unjust gains and to prove that customers relied on PBS's Section 5 violations in parting with their money. In light of the FTC's failure to satisfy its burden, and the fact that the Court already imposed a permanent injunction on Defendants, no further equitable monetary relief is necessary. To the extent the Court is inclined to grant equitable monetary relief, the Court should use its discretion to fashion an appropriate remedy based on the evidence, not speculation or unsupported presumption. Under the facts and circumstances of this case, Defendants propose three alternative equitable monetary awards in the amounts of $61,589,

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

$191,218.68 or $698,446.   Each of these alternatives is supported by the evidence and is sufficient to accomplish complete justice.

DATED this 16th day of March, 2011.

SNELL & WILMER L.L.P.


By:   /s/ Brian R. Reeve
     Jeffrey Willis, Esq.
     Brian R. Reeve, Esq.
     3883 Howard Hughes Parkway, Suite 1100
     Las Vegas, Nevada 89169
     *Attorneys for Publishers Business Services, Inc.*
     *and Ed Dantuma Enterprises, Inc.*

     Peter Homer (*admitted pro hac vice*)
     H. James Montalvo (*admitted pro hac vice*)
     Homer Bonner, P.A.
     1441 Brickell Avenue
     1200 Four Seasons Tower
     Miami, FL 33131
     *Attorneys for Brenda Schang, Dirk Dantuma,*
     *Dries Dantuma and Jeff Dantuma*

     David R. Koch (Nevada Bar No. 8830)
     Koch & Scow, LLC
     11500 S. Eastern Avenue, Suite 210
     Henderson, NV 89052
     *Attorney for Edward Dantuma and Persis Dantuma*

1

## **CERTIFICATE OF SERVICE**

2       I hereby certify that on March 16, 2011, I electronically transmitted the above document

3   to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of

4   Electronic Filing to all counsel in this matter; all counsel being registered to receive Electronic

5   Filing.

6

7                    _____Kathy Greene_____
                         An Employee of Snell & Wilmer
8

9

10

12680537

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28