1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

PUBLISHERS BUSINESS SERVICES, INC., *et al.*,

Defendants.

Case No. 2:08-cv-00620-APG-GWF

**ORDER (1) GRANTING FEDERAL TRADE COMMISSION'S MOTION FOR JUDGMENT AND (2) DENYING AS MOOT THE PARTIES' MOTIONS TO EXCLUDE EXPERTS**

(ECF Nos. 297, 312, 315)

The Federal Trade Commission (FTC) filed this enforcement action seeking injunctive and other equitable relief based on the defendants' unfair and deceptive practices when selling magazine subscriptions, in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule, 16 C.F.R. Part 310. Judge Philip Pro entered summary judgment in favor of the FTC on liability and issued a permanent injunction. ECF Nos. 151, 152. He also awarded $191,219.00 in equitable relief against some of the defendants. ECF No. 248. The FTC appealed the monetary award and the Ninth Circuit reversed and remanded for a recalculation of monetary equitable relief. ECF No. 266. Following Judge Pro's retirement, the case was assigned to me. ECF No. 273.

The parties have briefed their respective positions on the proper amount of monetary equitable relief. They also move to exclude each other's experts. I award monetary equitable relief in favor of the FTC and against defendants Publishers Business Services, Inc.; Ed Dantuma Enterprises, Inc.; Edward Dantuma; Brenda Dantuma Schang; Dries Dantuma; Dirk Dantuma; and Jeffrey Dantuma in the amount of $23,773,147.78.

**I. BACKGROUND**

The facts are laid out extensively in the summary judgment order. ECF No. 151. In brief, the defendants operated a magazine subscription service. The defendants would telephonically contact individuals at their place of business and tell them that they would get a "surprise" if they

participated in a survey.  The surprise was that the defendants were selling the consumer

magazine subscriptions.  The full details of the transaction were spread out over three stages: the

initial call with the sales representative, who then transferred the consumer to a shift supervisor,

and a later verification call.  The transaction was presented in a confusing and misleading manner

by fast-talking sales representatives, resulting in a net impression that the consumer was receiving

free magazines while having to pay only a nominal shipping and handling fee.  In fact, the

consumer was agreeing to pay hundreds of dollars in magazine subscription fees.  At summary

judgment, these practices were found as a matter of law to create a net impression likely to

mislead the consumer in a material way.

In addition to the deceptive initial sales practices, the defendants also engaged in

misleading and abusive collections practices when consumers refused to pay.  The defendants

would falsely tell consumers their accounts could not be canceled because the defendants had

already paid the publishers for the full subscription when in fact the defendants had not done so.

They also sent misleading collection letters from their "legal department" even though they had

no legal department.  Finally, the defendants made harassing and threatening phone calls.

Judge Pro entered summary judgment in favor of the FTC on liability and issued a

permanent injunction. ECF Nos. 151, 152.  The parties then presented evidence regarding

monetary equitable relief during a multi-day evidentiary hearing. ECF Nos. 239-41, 252-53, 255.

Judge Pro ruled that the FTC had not shown that complete disgorgement of profits was necessary

to redress consumer injury. ECF No. 248 at 3.  He considered full reimbursement to complaining

customers but concluded it would be impossible or impracticable to locate and reimburse those

customers. *Id.* at 3-4.  He thus concluded disgorgement of net revenues the defendants received as

a result of their violations was the proper remedy, and he adopted the analysis of the defendants'

expert, Dr. Gregory Duncan, to impose monetary equitable relief in the amount of $191,219.00.

*Id.* at 4.  Finally, Judge Pro ruled that there was insufficient evidence to hold defendants Persis

Dantuma, Brenda Dantuma Schang, Dirk Dantuma, and Jeffrey Dantuma individually liable. *Id.*

He therefore entered judgment in the amount of $191,219.00 against defendants Publishers

1   Business Services, Inc.; Ed Dantuma Enterprises, Inc.; Edward Dantuma; and Dries Dantuma. *Id.*

2   at 4-5.

3          The FTC appealed the monetary award and the Ninth Circuit reversed and remanded. ECF

4   No. 266.  As to individual liability, the Ninth Circuit directed that individual liability be imposed

5   on Dirk, Brenda, and Jeff, as well as Edward and Dries. *Id.* at 8.  As to the amount of monetary

6   relief, the Ninth Circuit ruled that Judge Pro "applied an incorrect legal standard when [he]

7   focused on the defendants' gain rather than the loss to the consumers." *Id.* at 3.  Judge Pro also

8   erred by relying on the fact that it may be impossible to locate and reimburse individual

9   customers. *Id.* at 4.

10         The Ninth Circuit found further error in the reliance on the defendants' expert, Dr.

11  Duncan, because his report was based on two flawed assumptions. *Id.* at 5.  First, Duncan

12  assumed most customers heard all the terms of the magazine subscriptions so they were not

13  misled. *Id.*  But the defendants' "fraud . . . was not simply the failure to disclose all pertinent

14  terms." *Id.*  Rather, they violated Section 5 "by the misrepresentations that launched the process,

15  among other reasons." *Id.*  Second, Duncan assumed the magazine subscriptions were not

16  valueless. *Id.*  But the Ninth Circuit stated this "assumption is not relevant even if true" because

17  restitution may be appropriate where the consumer injury "arises out of misrepresentations made

18  in the sales process, which lead to a tainted purchasing decision." *Id.* at 5-6 (quotation omitted).

19  Thus, consumers are entitled to a full refund where, as here, the "fraud is in the selling, not in the

20  value of the thing sold . . . ." *Id.* (quotation omitted).

21         The Ninth Circuit vacated the award and remanded for recalculation. *Id.* at 6.  In doing so,

22  the Ninth Circuit stated that the court "should base its calculation on the injury to the consumers,

23  not on the net revenues received by defendants." *Id.*  But "[t]hat does not mean that the district

24  court must accept the calculation proposed by the FTC":

25         PBS has argued, for example, that a customer who renewed subscriptions
           necessarily knew the actual terms of the transaction at the time of renewal.  A
26         similar argument was made regarding customers who added on to a subscription
           order.  The district court may consider these and other arguments in determining
27         the appropriate amount of damages to be awarded.

28

1   *Id.*

2       Following remand, the parties attempted to settle, and when that failed they engaged in

3 another round of expert discovery and briefing on the issue of monetary equitable relief.  In

4 relation to that briefing, the FTC moves to exclude the defendants' expert, Dr. Armando Levy.

5 The defendants move to exclude the FTC's psychological expert, Dr. Alan D. Castel.  The parties

6 also filed competing analyses of how the monetary equitable relief ought to be calculated.

7 **II.  ANALYSIS**

8       The FTC contends I should enter judgment in the amount of $23,773,147.78 based on the

9 presumption that all first-time orders were made in reliance on the deceptive practices.  The FTC

10 argues it is entitled to the presumption that every first-time customer relied on the deceptive sales

11 practices because the summary judgment order established the defendants' deceptive practices

12 were material and widely disseminated.  The FTC excluded from its calculation payments by

13 customers who renewed or added on to their subscriptions, consistent with the Ninth Circuit's

14 remand order.  However, the FTC did not exclude those same customers' initial subscriptions

15 because it takes the position that all first-time orders were tainted by the misleading practices,

16 even for those customers who later renewed or added on.

17       The defendants argue this court is not authorized to award monetary relief.  The

18 defendants also assert the FTC is not entitled to a presumption of consumer reliance because the

19 FTC has not shown the defendants' revenues were the result of widespread deception.  Rather, the

20 defendants contend, they had many satisfied customers.  Alternatively, the defendants argue their

21 expert has provided three different formulas for determining relief that more accurately reflect

22 consumer injury resulting from the violations.

23      **A.  Authority to Grant Monetary Equitable Relief**

24       District courts have the authority under Section 13(b) of the FTC Act to "grant any

25 ancillary relief necessary to accomplish complete justice, including restitution." *F.T.C. v.*

26 *Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016) (quotation omitted), *cert. denied sub*

27 *nom. Gugliuzza v. F.T.C.*, 2017 WL 69198 (U.S. Jan. 9, 2017); *see also F.T.C. v. Stefanchik*, 559

28

1   F.3d 924, 931 (9th Cir. 2009).  The defendants' argument that I lack authority to enter monetary

2   equitable relief is foreclosed by controlling authority.

3          Moreover, the defendants waived this argument in this case.  They did not appeal Judge

4   Pro's prior order entering a monetary award against them.  Nor did they raise the issue in their

5   briefs opposing the FTC's appeal before the Ninth Circuit. *See F.T.C. v. Publishers Business*

6   *Services, Inc., et al.*, No. 11-17270, ECF Nos. 22 (Answering Br.), 24 (Answering Br.), 57 (Pet.

7   for R'hrg En Banc).  Consequently, I have authority to enter monetary equitable relief in this

8   case.

9          **B.  Reliance**

10          The defendants argue that to order relief redressing consumer injury, there must be proof

11   that customers were injured by the deceptive practices, meaning the customers relied on the

12   deceptive practices in making their decision to purchase the magazines.  The defendants

13   acknowledge that under certain circumstances, the FTC is entitled to a presumption of consumer

14   reliance.  However, they contend the FTC has not met its burden of showing it is entitled to the

15   presumption, and, even if the presumption arises, the defendants argue they have rebutted it.

16          The FTC responds that it is entitled to the presumption of consumer reliance because the

17   summary judgment order established that the defendants' deceptive practices were material and

18   widespread.  Additionally, the FTC contends that the presumption was not rebutted, as the

19   evidence showed consumers were confused about the transaction.

20          "[P]roof of individual reliance by each purchasing customer is not needed" under

21   Section 13 of the FTC Act. *F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993).

22   Requiring a showing of individual reliance in FTC enforcement actions "would thwart effective

23   prosecutions of large consumer redress actions and frustrate the statutory goals of the section." *Id.*

24   (quotation omitted).  Thus, in such cases, the FTC is entitled to a "presumption of actual reliance"

25   once it "has proved that the defendant made material misrepresentations, that they were widely

26   disseminated, and that consumers purchased the defendant's product." *Id.* at 605-06.  If the FTC

27

28

1   makes this showing, "the burden shifts to the defendant to prove the absence of reliance." *Id.* at
2   606.

3                          *1. The FTC is Entitled to the Presumption*

4           There is no dispute that consumers purchased the defendants' magazine subscriptions and
5   that the misleading practices were material. The summary judgment order made a specific
6   materiality finding. ECF No. 151 at 30. The defendants contend, however, that the FTC has not
7   shown the misleading practices were widespread.

8           The summary judgment order, which the defendants did not appeal, describes the
9   widespread nature of the misleading practices. The evidence showed the defendants made
10  approximately 25 million calls during the relevant period. ECF No. 151 at 11. The defendants'
11  sales representatives, shift supervisors, and verifiers were directed to follow scripts for these calls
12  and those scripts comprised the misleading sales pitch. *Id.* at 3-5, 7-8, 27-30. Although some
13  employees deviated from the scripts, the evidence showed those deviations made the sales pitches
14  more misleading, not less so. *Id.*; *see also* ECF No. 94 at 25 (former employee stating that when
15  representatives deviated from the script, they "said whatever they felt they needed to say in order
16  to make a sale" and no employees were disciplined for deviating); *id.* at 31-32 (former employee
17  stating some telemarketers went off script to increase sales, telemarketers were not disciplined for
18  going off script, and even when off script, "the basic message of the script remained the same");
19  *id.* at 38-39 (former employee stating it was "an open secret" that "supervisors subtlety [sic]
20  encouraged the experienced telemarketers to go off script in order to increase sales"). The
21  defendants do not point to any evidence that the deviations cured the misleading statements in the
22  scripts or that the deviations were the norm. Indeed, when it suited them, the defendants argued
23  at summary judgment that the deviations were rare. ECF No. 131 at 8. The FTC thus is entitled
24  to a presumption that all consumers who purchased magazine subscriptions did so in reliance on
25  the misleading sales practices.
26  / / / /
27  / / / /
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 2. *The FTC Has Shown Reliance*

The defendants argue that even if the FTC is entitled to the presumption, they have rebutted that presumption through evidence that some customers were satisfied. The FTC responds that even those customers who testified they were satisfied were still confused about the terms of the transaction.

Under Federal Rule of Evidence 301, "[i]n a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally." The Ninth Circuit has adopted the "so-called 'bursting bubble' approach to presumptions" in some contexts. *See Nunley v. City of L.A.*, 52 F.3d 792, 796 (9th Cir. 1995) (finding bursting bubble approach appropriate in the context of Federal Rule of Appellate Procedure 4(a)(6) in relation to the presumption that a document that was mailed was received). Under the bursting bubble approach, "a presumption disappears where rebuttal evidence is presented." *Id.* Upon presentation of evidence rebutting the presumption, the district judge "must then weigh the evidence and make a considered factual determination . . ., rather than denying the motion out of hand . . . ." *Id.* I may find consumer reliance, despite the presentation of rebuttal evidence, based on all the evidence including the very facts that support the presumption. *Id.*

Assuming the bursting bubble theory would apply to the presumption of consumer reliance in an FTC enforcement action, it is questionable the defendants' evidence even rebuts the presumption. The fact that some customers were ultimately satisfied with the magazines they purchased does not necessarily mean their original decision to purchase was free from the taint of the defendants' deceptive sales practices. "The injury to a consumer occurs at the instant of a seller's misrepresentations, which taint the consumer's subsequent purchasing decisions." *F.T.C. v. BlueHippo Funding, LLC*, 762 F.3d 238, 244 (2d Cir. 2014); *see also Figgie Int'l, Inc.*, 994 F.2d at 606 (stating the "seller's misrepresentations tainted the customers' purchasing decisions" and the "fraud in the selling . . . is what entitles consumers . . . to full refunds").

1    Even if the presumption bubble has burst, the FTC has met its burden of showing

2    consumer reliance.  The evidence underlying the presumption supports the conclusion that every

3    initial order was tainted by the defendants' Section 5 violations.  The defendants made millions of

4    sales calls using scripts that were materially misleading as a matter of law.  The FTC has

5    presented evidence from consumers that they were misled into giving money to the defendants by

6    the misleading sales pitch.  *See* ECF Nos. 5 at 10-11, 35-40[1]; 5-2 at 1-3; 96 at 39-43, 69-70, 87-91;

7    241 at 4, 7-16, 90.  The defendants' witnesses who testified they were satisfied nevertheless

8    appeared to be confused about, or unaware of, the terms of the transaction.[2]  The FTC therefore

9    has shown reliance on the Section 5 violations to support an award of monetary equitable relief.

10   **C.  Calculation of the Restitution Amount**

11   Following the remand in this case, the Ninth Circuit adopted a "two-step burden-shifting

12   framework . . . for calculating restitution awards under § 13(b)." *Commerce Planet, Inc.*, 815 F.3d

13   at 603.  "Under the first step, the FTC bears the burden of proving that the amount it seeks in

14   restitution reasonably approximates the defendant's unjust gains, since the purpose of such an

15   award is 'to prevent the defendant's unjust enrichment by recapturing the gains the defendant

16   secured in a transaction.'" *Id.* (quoting 1 Dobbs, Law of Remedies § 4.1(1), at 552).  Unjust gains

17   "are measured by the defendant's net revenues (typically the amount consumers paid for the

18   product or service minus refunds and chargebacks), not by the defendant's net profits." *Id.*

19   Unjust gains are not measured by "the consumers' total losses" because "that would amount to an

---

[1] This customer made payments but received a refund.  Her injury therefore would not be part of the monetary relief award, but her testimony supports the conclusion that consumers relied on the Section 5 violations to make payments.

[2] *See* ECF Nos. 241 at 147-54 (customer Benjamin Ryne testifying he understood the defendants were selling magazines, the magazines were not free, he was a satisfied customer, but he was unaware of the total price of the magazines); *id.* at 162-77 (customer Jodi Cairo testifying she understood she would have to pay for the magazines and she was a satisfied customer, but she did not know how many months or years she had agreed to pay); 253 at 116-25 and Evid. Hrg. Ex. 48 (customer Wendy Goken testifying she understood she would have to pay and she was satisfied but she did not know how much the payments were for, she did not know for how long the payments would need to be made, and she did not understand what the total cost was); Recording of Hrg. from June 8, 2011, testimony of Shannon Meehan (testifying she knew how much she was paying and thought she was getting a good deal but she did not comparison shop and could not identify on what basis she thought the defendants' magazines were a good deal; she just liked the convenience).

1  award of damages, a remedy . . . precluded under § 13(b)." *Id.*  However, in many cases, like this

2  one, "the defendant's unjust gain will be equal to the consumer's loss because the consumer buys

3  goods or services directly from the defendant," without a middleman. *Id.* (quotation omitted).

4        If the FTC meets its burden, "the burden then shifts to the defendant to show that the

5  FTC's figures overstate the amount of the defendant's unjust gains." *Id.* at 604.  "Any risk of

6  uncertainty at this second step fall[s] on the wrongdoer whose illegal conduct created the

7  uncertainty." *Id.* (quotation omitted).

8                   *1.  The FTC Has Met Its Initial Burden*

9        The parties agree the defendants collected $24,038,392.03 from first-time orders. ECF

10  Nos. 312-5 at 12; 316-1 at 5-6, 16-17.  The parties also agree that the defendants issued

11  $265,244.25 in chargebacks and refunds. ECF Nos. 132-2 at 19; 312 at 14-15. Under *Commerce*

12  *Planet*, the defendants' net revenues of $23,773,147.78 reasonably approximate the defendants'

13  unjust gains ($24,038,392.03 paid by consumers minus refunds and chargebacks of $265,244.25,

14  equaling $23,773,147.78).

15        In light of the Ninth Circuit's remand order, the FTC has not requested any revenues from

16  renewal or add-on orders.  The defendants argue the initial order for any customer who later

17  renewed or added on to their orders should also be removed from the restitution amount.

18  However, the fact that a customer was satisfied with the product or service does not mean that

19  customer's initial purchasing decision was not induced by the defendants' misleading practices.

20  Indeed, the Ninth Circuit suggested that renewals or add-ons may be excluded from restitution if

21  those customers "necessarily knew the actual terms of the transaction at the time of renewal."

22  ECF No. 266 at 6.  The Ninth Circuit did not suggest that those customers necessarily knew the

23  terms at the time of the original purchase, nor did it suggest that the defendants' misleading

24  tactics did not taint the initial purchase decision for these customers.  To the contrary, the Ninth

25  Circuit noted that the defendants violated Section 5 "by the misrepresentations that launched the

26  process, among other reasons." *Id.* at 5.  The FTC's calculation thus reasonably approximates the

27  defendants' unjust gains by including the first-time orders for all customers.  As discussed above,

28

1   the FTC has met its burden of showing that all first-time orders were tainted by the defendants'

2   Section 5 violations.

3                    *2. The Defendants Have Not Shown the Amount is Overstated*

4             The burden thus shifts to the defendants to show that the FTC's requested amount

5   overstates the amount of their unjust gains.  The defendants rely on their expert, Dr. Levy.  In

6   response, the FTC seeks to exclude Dr. Levy under *Daubert* because his opinions contradict the

7   Ninth Circuit's remand order and unjustifiably exclude large numbers of consumers from the

8   restitution calculation.

9             Dr. Levy gives three alternative amounts by which to measure monetary equitable relief.

10   First, he proposes that the amount of economic harm suffered by misled consumers is

11   approximately $465,000. ECF No. 316-1 at 16-17, 24-25.  I reject this proposed calculation

12   because it conflicts with the Ninth Circuit's remand order in this case.  This calculation involves

13   an assumption that consumers valued the magazines they received and discounts consumer injury

14   by approximately ninety-five percent based on the magazines' value. *See* ECF No. 316-1 at 9, 21-

15   24.  The Ninth Circuit's remand order specifically rejected the prior expert's opinion because he

16   assumed the magazine subscriptions had value. ECF No. 266 at 5.  The Ninth Circuit stated this

17   "assumption is not relevant even if true" because restitution may be appropriate where the

18   consumer injury "arises out of misrepresentations made in the sales process, which lead to a

19   tainted purchasing decision." *Id.* at 5-6 (quotation omitted).  Thus, consumers are entitled to a full

20   refund, with no discount for the value of the magazines, where, as here, the "fraud is in the

21   selling, not in the value of the thing sold . . . ." *Id.* (quoting *Figgie Int'l, Inc.*, 994 F.2d at 606).

22             Dr. Levy also does not adequately support his assumption that 67.5 percent of customers

23   who were unhappy called the defendants to cancel or complained to a third party. *See* ECF No.

24   316-1 at 24.  Although Dr. Levy extrapolated from studies on complaint rates, those studies had

25   rather unhelpful complaint-rate ranges from 10 to 84 percent. *Id.* at 14-15.  Dr. Levy explained

26   that he leaned toward the high end because the defendants offered a service component and

27   because the deception involved the price to be paid, which was the core of the bargain between

28

1   the parties. *Id.* at 15.  But he does not explain why this leads to the assumption of 67.5 percent as

2   opposed to some other number.  Dr. Levy also confined his group of complaining customers to

3   those who complained to a third party or called the defendants to cancel. ECF No. 316-1 at 16.

4   He does not explain why he did not attempt to capture complaints unaccompanied by a request to

5   cancel. *See* ECF No. 102 at 138-66 (first payment coupons from customers showing complaints

6   that consumers preferred not to be called at work, sales representatives talked too fast, consumers

7   were rushed into the decision, were "forced into buying," and did not understand or received a

8   poor explanation of the transaction's terms).  Nor does he explore whether the defendants'

9   deceptive sales practices themselves contributed to a lower cancellation rate from unhappy

10  customers where customers were told they could not cancel. ECF No. 151 at 17, 30-31 (part of

11  deceptive practices was telling customers they could not cancel).

12          Moreover, Dr. Levy assumes a certain percentage of the defendants' customers were

13  "satisfied" and thus suffered no or *de minimis* injury. ECF No. 316-1 at 17.  But the mere fact that

14  some customers renewed or added on does not show that the initial purchasing decision for these

15  customers was not induced by the Section 5 violations.  The defendants bear the risk of

16  uncertainty as to whether there were some customers who were not deceived and did not have

17  their original purchasing decision tainted by the defendants' misleading practices.  They have not

18  provided me a reliable method of determining how many customers fall into this category.  I

19  therefore make no deduction from first-time orders based on so-called "satisfied" customers.[3]

20          Dr. Levy's second proposal suggests the amount of relief be bounded by the defendants'

21  profits of $698,446 based on Dr. Duncan's prior analysis. ECF No. 316-1 at 12-13.  I reject this

22  analysis because the Ninth Circuit's remand order makes clear that relying on Dr. Duncan's

23  profits analysis is error. ECF No. 266 at 3.

24

25          [3] The Ninth Circuit has suggested there is no authority to reduce an equitable restitution award for

26  "satisfied" customers. *See Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1195-96 (9th Cir. 2016)
    ("Gordon argues that the district court should not have included fees paid by 'satisfied' consumers.  There

27  is no precedent for this proposition.").  Even if I interpret "satisfied" to mean the customer was neither
    misled nor had their purchasing decision tainted, the defendants have not presented a reliable method for

28  determining how many customers fall into this category.

1    Finally, Dr. Levy estimates the defendants' revenues from the Section 5 violations

2    amounts to $1.15 million.  I reject this analysis because Dr. Levy assumes misled customers

3    would seek to cancel before making any payment and he thus excludes from this number revenue

4    from customers who never contacted the defendants to cancel and never complained to a third

5    party. ECF Nos. 316-1 at 17-18, 20; 297-3 at 25-26.  Dr. Levy does not provide an adequate basis

6    for this assumption and it contradicts his own statement elsewhere in his report that he "expect[s]

7    that there are customers who were unhappy but nevertheless failed to complain." ECF No. 316-1

8    at 15; *see also* ECF No. 297-3 at 32 (Dr. Levy's deposition testimony in which he cites no studies

9    or literature to support his assumption that dissatisfied customers would cancel before their first

10   payment).  Moreover, it contradicts the evidence in this case, which shows some consumers

11   complained but still paid the defendants without canceling or complained after they made

12   payments. *See* ECF Nos. 5 at 10-11, 35-40; 5-2 at 1-3; 96 at 39-43, 69-70, 87-91; 102 at 138-66.

13   Thus, even if I consider Dr. Levy's report, the defendants have not met their burden of

14   showing the FTC's calculation overstates their unjust gains.  Accordingly, I will award the FTC

15   $23,773,147.78 in monetary equitable relief against defendants Publishers Business Services,

16   Inc.; Ed Dantuma Enterprises, Inc.; Edward Dantuma; Brenda Dantuma Schang; Dries Dantuma;

17   Dirk Dantuma; and Jeffrey Dantuma.  Because I reach this conclusion while considering Dr.

18   Levy's report and without considering Dr. Castel's report, I deny the parties' respective motions

19   to exclude as moot.

20   **III.  CONCLUSION**

21   IT IS THEREFORE ORDERED that plaintiff Federal Trade Commission's motion for

22   judgment **(ECF No. 312) is GRANTED**.  Plaintiff Federal Trade Commission is awarded the

23   sum of $23,773,147.78 as monetary equitable relief against defendants Publishers Business

24   Services, Inc.; Ed Dantuma Enterprises, Inc.; Edward Dantuma; Dries Dantuma; Brenda Dantuma

25   Schang; Dirk Dantuma; and Jeffrey Dantuma, joint and several.  The Clerk of Court shall enter

26   judgment accordingly.

27

28

1    IT IS FURTHER ORDERED that plaintiff Federal Trade Commission's motion to

2    exclude the testimony of Dr. Armando Levy **(ECF No. 297) is DENIED as moot**.

3    IT IS FURTHER ORDERED that the defendants' motion to exclude putative expert Alan

4    Castel **(ECF No. 315) is DENIED as moot**.

5    IT IS FURTHER ORDERED that unless a motion to seal is filed by any party within 21

6    days of the date of this order, plaintiff Federal Trade Commission's motion to exclude testimony

7    of Dr. Armando Levy (ECF No. 297) shall be unsealed.  If any party determines that any portion

8    of the filing should remain sealed, that party must file a renewed motion to seal along with a

9    proposed redacted version of the filing.  Any motion to seal must set forth compelling reasons to

10   support sealing those portions.

11   DATED this 1st day of February, 2017.

12

13
ANDREW P. GORDON
14
UNITED STATES DISTRICT JUDGE